683 So.2d 1342 (1996)
Monica STROIK
v.
Wilbur PONSETI, Warren Woodfork, the City of New Orleans, and Royal Insurance Company.
Nos. 96-CA-0842, 96-CA-1500.
Court of Appeal of Louisiana, Fourth Circuit.
November 6, 1996.
Writ Granted February 7, 1997.
*1344 Dennis P. Couvillion, James Minge & Associates, New Orleans, for Plaintiff/Appellee Monica Stroik.
Franz L. Zibilich, Chief Deputy City Attorney, Avis Marie Russell, City Attorney, New Orleans, for Defendants/Appellants Wilbur Ponseti and City of New Orleans.
Before SCHOTT, C.J., and KLEES and WALTZER, JJ.
WALTZER, Judge.

STATEMENT OF THE CASE
Monica Stroik sued Wilbur Ponseti, an officer of the New Orleans Police Department, Police Superintendent Warren Woodfork, the City of New Orleans (the City) and Royal Insurance Company (Royal) to recover damages sustained as a result of Officer Ponseti's negligent conduct in shooting Ms. Stroik, a hostage and victim of an armed car-jacking, in the course of apprehending the perpetrator. Royal, the insurer of the car-jacked vehicle was dismissed by summary judgment. Ms. Stroik filed a complaint in the United States District Court for the Eastern District of Louisiana for damages and deprivation of Civil Rights under 42 U.S.C.1983 and 1988. Stroik v. Ponseti and Woodfork, Civil Action No. 90-4161[1]. She attempted to file a supplemental and amending complaint asserting her state negligence claim, but that amendment was successfully resisted by defendants Ponseti and Woodfork. The federal jury returned a verdict in favor of Ms. Stroik which was ultimately reversed by the United States Court of Appeals for the Fifth Circuit. Stroik v. Ponseti, 35 F.3d 155 (C.A.5 1994).
Following a trial in Civil District Court on the merits of the state negligence claim judgment was rendered in favor of Ms. Stroik and against Officer Ponseti and the City awarding general damages of $450,000, past medical expenses of $114,084.11 and future medical expenses of $30,000. From the judgment finding liability and from the judgment fixing costs Officer Ponseti and the City appeal. The appellants have not appealed the trial court's determination of quantum. These appeals were consolidated for hearing. Finding no error in the judgment rendered below, we affirm.

STATEMENT OF FACTS
On 27 October 1989, Ms. Stroik came from Vermont to New Orleans to visit her brother, who was to be received into the Discalced Carmelite Order the next day. Brother Christopher Stroik had been living in New Orleans for a year working as a volunteer with Covenant House. After dinner with his religious community, Brother Stroik and Ms. Stroik walked to Rampart Street where a blue Chevrolet Astro-Van which Covenant House owned and allowed Brother Stroik to use was parked. The van bore a Covenant House sticker with the Nine Line telephone hot-line number. As he opened the passenger door for Ms. Stroik, two men approached, one armed with a gun, and ordered Brother Stroik and Ms. Stroik into the van. The robbers ordered Brother Stroik to drive and took the Stroiks' money and jewelry and an envelope containing their parents' travel information. One of the robbers, Paul Johnson, ordered Stroik to stop the van near a housing project, ordered Brother Stroik into the front passenger seat of the van and began to drive through the Garden District and Uptown New Orleans, stopping three times to rob victims on the street. The younger robber remained in the back seat with Ms. Stroik.
The first robbery occurred in the Garden District. Johnson approached an apparently white couple from behind. Brother Stroik saw their faces briefly as they turned to respond to the robber. Approximately twenty minutes later, near Carrollton Avenue, Johnson stopped the van in front of an apparently white male victim and robbed him, to the right of the van. The third robbery took place closer to Audubon Park when Johnson stopped the van about ten to fifteen feet behind a man walking a dog. Brother *1345 Stroik tried to make eye contact with the victim, whom he saw as a potential source of help, but was unable to do so. At no time during the course of the robberies did Johnson fire his gun or use it to strike his victims. Shortly after the third robbery, Brother Stroik heard sirens as the robber pulled the van onto St. Charles Avenue. The sirens and flashing lights, together with the van's increased speed, gave Brother Stroik the impression that police were chasing the van. Johnson drove down St. Charles Avenue, turned onto Milan Street, struck a pedestrian, and continued through a maze of people and cars, turning against the flow of traffic onto Baronne Street, a one-way street. One police car continued down Milan Street, while two others followed the van. Officer Daryl Ribet drove the police car directly following the van. Officer Kevin Balancier drove the second police car in which Officer Ponseti rode as a passenger.
Just before the van stopped, the younger robber in the back seat of the van asked how to open the passenger door, Brother Stroik unlatched it and the younger robber jumped out and ran down the street. Officer Ribet had stopped his car just to the left of the van, and Officer Balancier stopped in the intersection of Baronne and Constantinople Streets to the right rear of the van. Officer Balancier chased the robber and Officer Ponseti exited his police car. The van's sliding door opened to its full extent as the van came to a halt and the driver began to leave the van. Johnson grabbed Ms. Stroik and pushed her out of the right side of the van. Officer Ponseti at that time did not know whether Ms. Stroik was a suspect or was armed. Without seeking cover himself or giving any warning, Officer Ponseti opened fire from a distance of about four feet, wounding Ms. Stroik and killing Johnson, who did not return fire. When Brother Stroik heard the first shot, he looked to the right through the van's passenger side window, heard a pause, ducked below the dashboard and then heard several louder shots. The trial judge concluded from the timing of the shots that the first shot struck Ms. Stroik, who was pushed out of the van by Johnson[2]; during the pause after the first shot, Johnson appeared, and Officer Ponseti fired the remaining shots into him. After the shots were fired, Brother Stroik heard Officer Ponseti call, "Get down, get down, you're dead, you're dead, you're dead," with his arm extended holding a gun, presumably pointing at the ground. Officer Ponseti then told Brother Stroik to get out. He did so, slowly, whereupon Officer Ponseti pointed his gun at Brother Stroik's head and said, "You're dead, you're dead, you're dead." A police officer standing to the left of Officer Ponseti escorted Brother Stroik down out of the van, handcuffed him and put him on the ground, face down. According to Brother Stroik, Officer Ponseti appeared angry and enraged, with his face contorted. Brother Stroik saw that his sister was lying on the ground, motionless. She began to squirm and throw up, groaning that she was hurt. Beyond her lay Johnson, very bloody and obviously wounded. Stroik asked to see his sister, but Officer Ponseti refused, and attempted to handcuff the seriously wounded woman. An ambulance came for Ms. Stroik, whereupon Brother Stroik waited for about fifteen minutes and went with an officer to give a statement at police headquarters. He asked the police to pick up his parents and brother at the airport and eventually was released to them.

ANALYSIS
The trial court in reasons for judgment rejected Officer Ponseti's testimony concerning the incident, finding that he made conflicting sworn statements regarding critical aspects of the shooting and that his answers were evasive. The record reflects that the trial judge admonished Officer Ponseti's counsel for "cuing" his testimony, suggesting helpful responses. Our review of the record finds ample support for the trial court's credibility determination and finds the record replete with examples of cuing and comments by counsel on Officer Ponseti's testimony as it was being received. Officer Ponseti admitted that his testimony "evolved" over the period since the incident.
*1346 The record provides many examples of Officer Ponseti's evasion, argumentative and hostile demeanor and inconsistent sworn statements. Officer Ponseti testified that in connection with his NOPD employment application, he took a psychological test. A psychologist's report of 22 June 1987 rendered in connection therewith found:
Evidence of Pathology. Applicant responded to both tests in such an evasive, naively denying and avoidant manner that further personality description may be questionable other than to suggest lack of insight and awareness, inflexibility, and intolerance and/or conscious misrepresentation itself. In addition, there are suggestions of immaturity, problems of control, by degree of dissatisfaction and unhappiness and unsettledness.
He received "1" or "Poor" ratings for Tolerance and Open-mindedness and for Impulse Control. He received a "2" rating in Hypochondriasis, Stability/maturity and Probable Adjustment to Organization. His highest rating was a "3" out of a possible "5" in Achievement Motivation and Self-confidence. The psychologist recommended a personal psychiatric evaluation. He was sent to Gabe Rodriguez, a psychologist, and went through what Officer Ponseti described as other phases of evaluation before he was hired. He completed his training in January 1988, twenty-two months before the incident in question, graduating first in his class. His testimony at trial creates a clear inference that while he answered the examination questions concerning street survival and armed confrontation in the manner he believed to be correct according to his training, he did not feel constrained to follow those guidelines should he actually be faced with those issues.
He admitted at trial that finding and utilizing cover are important street survival tactics when approaching a pedestrian suspect believed to be armed. He also admitted that he was trained to avoid placing himself in the kill zone, an area where an officer is vulnerable to being shot, when attempting to arrest an armed suspect. He admitted that as a general rule, once cover is established in a kill zone, leaving that cover is inconsistent with his training.
David Morales, a retired NOPD officer, testified that he conducted the investigation of the robber's homicide. In that connection, he took Officer Ponseti's statement, which Morales recorded verbatim.
According to Officer Ponseti's statement, on the evening of 27 October 1989, just prior to the end of a three p.m. to eleven p.m. shift, he received word by police radio that armed robberies were being committed from a blue Astro van. Descriptions were of two armed males of apparent African descent, an apparently white woman and an apparently white male. Subsequently, they heard that a blue van, occupied by four people, passed St. Charles Avenue and Audubon Place, traveling downtown. Officer Ponseti and his partner turned onto Jefferson Avenue. As they approached the intersection of Jefferson and St. Charles Avenues, they saw a blue van followed by NOPD Unit 2226, employing its blue lights and sirens, which was in turn followed by an unmarked NOPD unit. Officer Balancier turned onto St. Charles and employed his blue lights and siren. The van continued on St. Charles, weaving in and out of traffic, to Milan, where it struck a pedestrian. The police units continued to follow the van, which ultimately appeared to lose control and wreck into the curb at the downtown lake corner of Constantinople and Baronne Streets. The van came to a complete stop, the driver side door opened and a black male jumped out of the van and began running away towards Dryades Street. Officer Balancier and the officer from the unmarked NOPD car chased the suspect. Officer Ponseti then exited his car, and approached the van, observing a white male seated in the front passenger seat duck down under the dashboard. As Officer Ponseti neared the van, the sliding door on the right side of the van opened and a black male slid out of the van on his back, with the white female in his left arm, on top of him. Officer Ponseti was able to see only the upper torso, both arms, head and neck of the black subject, and said the white female was on top of the subject's *1347 legs, no higher than his waist[3]. The subject held a gun in his right hand, and his left hand was around the woman's throat. Officer Ponseti claimed he approached the two subjects with his weapon drawn, for his own safety. He claimed that the man, who was about six feet from Officer Ponseti, pointed his pistol toward Officer Ponseti's face. Officer Ponseti fired his weapon at the subject and observed that he was struck several times. The subject dropped the pistol and lapsed into unconsciousness. Neither Officer Ponseti nor any other officer said anything by way of warning or command. Morales testified that he did not suggest or coerce any part of Officer Ponseti's statement, and that Officer Ponseti appeared to be in full control of his faculties when he made the statement. Morales showed the statement to Officer Ponseti and gave him a copy. Officer Ponseti did not point out any deficiency or inaccuracy in the statement.
Officer Ponseti's sworn testimony was materially inconsistent, argumentative and evasive. The trial testimony was internally inconsistent and contradicted his prior statement, sworn deposition and federal trial testimony. By way of example, at the trial, Officer Ponseti denied that he used the back of the van as cover, and, indeed, that he did not establish cover before shooting Ms. Stroik and Johnson; at his federal trial, he testified that he used the van as concealment, not merely coincidentally; however, in his deposition, he testified twice that he used the back of the van as cover. Testimony at trial and deposition differed on the direction and speed at which he approached the van. At trial he denied having seen Brother Stroik duck down under the dashboard, contradicting his statement to Officer Morales. He later changed his testimony, returning to the facts as stated to Officer Morales, but claiming that he saw Brother Stroik duck down before firing his first shot. This contradicts Brother Stroik's testimony that it was the sound of the first shot that caused him to duck. The trial court reasonably chose to accept Brother Stroik's testimony, which is both credible and consistent with natural human instinctual behavior.
Officer Ponseti's testimony concerning how Ms. Stroik and Johnson exited the van varied between his deposition, federal civil rights trial and state negligence trial. Significantly, Officer Ponseti's statement to Officer Morales and Officer Ponseti's testimony in his 5 March 1991 deposition indicate that Ms. Stroik and Johnson were shot when they were on the ground. After Officer Ribet testified at the federal civil rights trial that both victims were standing upright when shot, and that Johnson had not fully exited the van, Officer Ponseti changed his testimony, denying that he shot Ms. Stroik and Johnson when they were on the ground.
Officer Ponseti's trial and deposition testimony differed as to whether he knew or had reason to know prior to the confrontation that the van was owned by Covenant House. At trial, Officer Ponseti testified that one of the reports he heard while involved in pursuit of the robbers indicated that a white subject was armed. This contradicts his statement given approximately two hours after the incident, that two males of apparent African descent were armed.
At trial, Officer Ponseti testified that he may have drawn his gun before he exited his NOPD vehicle. He admitted there was a large group of bystanders on the corner.
Officer Ponseti testified variously at his deposition and at trial concerning the path he took when he left his police car. It is significant that none of the paths to which he testified were consistent with his police training, to take cover.
Officer Ponseti attempted to explain the discrepancies among his original statement, deposition testimony and testimony at his federal and state trials by suggesting that he has had memory problems since the incident and suffers from depression. He testified that he sought professional help for his memory problem from psychiatrist Dr. Robert Barnes, who prescribed Wellbutrin and Klonopin. *1348 Officer Ponseti was evasive as to the reason these drugs were prescribed.
FIRST ASSIGNMENT OF ERROR: The trial court erred in denying defendants' exception of res judicata.
The City and Officer Ponseti claim that the decision of the United States Court of Appeals for the Fifth Circuit, reversing the district court jury verdict rendered in favor of Ms. Stroik on the federal civil rights action is res judicata, barring Ms. Stroik's state negligence claim. This assignment was considered and rejected on writ application by a panel of this Court in Stroik v. City of New Orleans, et al., 95-C-1351 (La.App. 4 Cir. 6/30/95). Consequently, this Court's decision became the law of this case.
Under the law of the case doctrine, an appellate court generally may not reconsider its prior rulings when the case returns on direct appeal. Day v. Campbell-Grosjean Roofing & Sheet Metal Corp., 260 La. 325, 256 So.2d 105, 107 (La.1971). The justifications for application of the law of the case doctrine include avoidance of indefinite relitigation of the same issue; internal consistency of litigation; fairness to both parties by allowing a single opportunity for argument and decision of the pertinent issue; and judicial efficiency. Id. Under the factual circumstances of the instant case, the exception of res judicata was fairly presented in the application for supervisory writs and this Court's denial of the exception promotes the policies behind the law of the case doctrine. Furthermore, adhering to the Court's earlier decision fosters internal consistency and judicial efficiency.
In some rare cases an appellate court may, in its discretion, review an earlier decision, but such review is justified only in cases of palpable error or where application of the doctrine causes manifest injustice. In re M.W., 93-1809 (La.App. 4 Cir. 6/30/94), 641 So.2d 582, 584, citing Day, supra, 256 So.2d at 107. This is not such a case. After a complete review of the record, we find it more likely that manifest injustice would result were this court to determine that Ms. Stroik's claim is barred by res judicata.
The record shows that Ms. Stroik attempted to amend her federal suit to add the pendent state negligence claim, but that amendment was vigorously and successfully opposed by counsel for the City. Ms. Stroik's federal Civil Rights claims were separate from her state law negligence claim, and the federal court did not consider the merits of the negligence claim. The United States Magistrate Judge denied Ms. Stroik's amendment of the federal complaint to add her state negligence claim, holding:
The amendment adds a party and a new theory of liability [negligence] and would necessarily upset the current trial date. Plaintiff will not be prejudiced by the denial of the amendment because he [sic] has a long-pending state court case in which he [sic] has asserted the state law claims included in the proposed amendment. Furthermore, the Magistrate Judge notes that if the amendment were allowed, the state law claims would necessarily predominate over the federal law claims.
Counsel for the City and Officer Ponseti admitted at the appellate hearing and the transcript of the federal Civil Rights trial confirms that the City argued to the federal jury that Ms. Stroik's negligence claim was for "another lawsuit for another day, that is not before you."
In determining the res judicata effect of a judgment rendered by a federal court, we apply the federal law of res judicata. Reeder v. Succession of Palmer, 623 So.2d 1268, 1271 (La.1993). That law treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same claim or cause of action. Id. Generally, if a set of facts gives rise to a claim based on both state and federal law, and the plaintiff brings the action in a federal court having pendent jurisdiction to hear the state cause of action, but the plaintiff fails or refuses to assert his state claim, res judicata prevents him from subsequently asserting the state claim in a state court action unless the federal court clearly had no jurisdiction over the state claim or, having jurisdiction, clearly would have declined to exercise it as a matter of discretion. *1349 Reeder, 623 So.2d at 1272-73, citing Restatement (Second) of Judgments (1982) Secs. 24, 25 and 25, Comment (e). In this case, the federal court, in the exercise of its discretion and with the expectation that Ms. Stroik would pursue her negligence claim in state court, declined to exercise jurisdiction over the state claim, with the active agreement of the counsel for the City. Under Reeder, the federal judgment is not dispositive of Ms. Stroik's state negligence claim. This assignment of error is without merit.
SECOND ASSIGNMENT OF ERROR: The trial court erred in failing to apply the legal standard of reasonableness under the totality of circumstances in determining the defendant officer's liability.
To prevail on a negligence claim under La.C.C. arts. 2315 and 2316 a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard; (2) the defendant failed to conform his conduct to the appropriate standard; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages. Mathieu v. Imperial Toy Corp., 94-0952 (La.11/30/94), 646 So.2d 318, 321-322; Roberts v. Benoit, 605 So.2d 1032 (La.1991).
Duty is a question of law. Simply put, the inquiry is whether the plaintiff has any lawstatutory, jurisprudential or arising from general principles of faultto support his claim. Faucheaux v. Terrebonne Consol. Government, 615 So.2d 289, 292 (La.1993). The scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty. Rules of conduct are designed to protect some persons under some circumstances against some risks. The scope of protection inquiry asks whether the enunciated rule extends to or is intended to protect this plaintiff from this type of harm arising in this manner. In determining the limitation to be placed on liability for defendant's substandard conduct, the proper inquiry is often how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced. Faucheaux, supra, 615 So.2d at 293-294.
As a member of NOPD, Officer Ponseti is clothed with the authority to enforce the laws of the city and state within his jurisdiction and subject to the orders of his superior officers. These orders may take the form of direct commands as well as established practices, procedures and regulations. Along with this authority, the officer has the right to carry and, when appropriate, to use deadly weapons. A necessary concomitant of the social contract that confers upon him that authority and those rights is his duty to exercise both with respect and concern for the well being of those he is employed to protect and serve.
There was uncontroverted testimony by Chief George Armbruster, tendered and accepted in the federal civil rights suit as an expert in law enforcement, practice and procedure, particularly within the area of use of force and police training, that Officer Ponseti's actions were not proper police procedure in a high-risk vehicle stop situation involving a known felony and known felony suspects. Chief Armbruster was an author of the 1982 Louisiana Peace Officers Standards and Training manual, and testified that in the instant situation, Officer Ponseti should have controlled the situation, utilizing available cover and trying to control the situation before approaching the suspects. According to Chief Armbruster, Officer Ponseti violated the standard of conduct when he failed to utilize cover and to give verbal commands to try to isolate the movements of the subjects. The purpose is not only to protect the officer, but also to try to maintain psychological superiority in dealing with the subjects prior to actually placing hands on them. Chief Armbruster noted that because of the intense emotional level following a pursuit such as this one, it is important that officers use sound tactics. Because the officer is likely to be influenced by adrenaline in such a situation, he is trained to respond according to his training, rather than to rely on his own impulses. According to Chief Armbruster, under both scenarios given by Officer Ponseti, the officer's actions were improper. Officer Ponseti failed to use available cover or, if he *1350 initially used cover and then abandoned it, he improperly abandoned cover before he had control of the situation.
The duty that arises from these standard police procedures flows not only to the police officer for whose immediate protection the procedures exist, but also to innocent bystanders and hostages like Ms. Stroik who may be placed in enhanced danger through an officer's violation of those procedures.
To determine the reasonableness of policeman's conduct in approaching and attempting to disarm a suspect, the breach of duty element, the legal test is one of reasonableness under the totality of the circumstances, which should be determined through consideration of the factors enunciated in Kyle v. City of New Orleans, 353 So.2d 969 (La.1977) and applied to duty/risk analysis in Mathieu, supra, 646 So.2d at 321-323.
The first Kyle factor is the known character of the subject. Ponseti knew or had reason to know that one perpetrator was armed, but had not fired his pistol in the three armed robberies, nor had the perpetrator battered any of his victims.
The second factor is the risk and danger faced by Officer Ponseti. In this case, he knew the perpetrator had not yet injured any of his robbery victims, and he knew that there was ample police back-up. Officer Ponseti was far from alone. His partner and Officer Ribet were at the scene as were at least three police vehicles. Officer Ponseti reasonably believed the perpetrator was armed, but he had the opportunity, through application of the police training that should have been instinctive, to prevent armed confrontation.
The third factor is the nature of the offense. In responding to complaints of armed robbery, Officer Ponseti had reason to believe that the incident was serious and potentially life-threatening, and should have followed the appropriate police procedure testified to by both Officer Ponseti and Chief Armbruster: to take cover and stay out of the kill zone.
The fourth Kyle factor, likelihood of escape, in this case was not high. The van had come to a stop, one of the perpetrators had fled on foot with a police officer in pursuit, and the area was filled with police units and bystanders.
The fifth Kyle factor is the existence of alternative methods. As the expert testified, alternative methods for dealing with this situation not only existed, but were standard police procedure. While the scope of Officer Ponseti's duty to act reasonably under the circumstances does not operate to restrict him to employing only the best of several available alternatives, he is required to choose a reasonable alternative under the circumstances which existed. To come out of his police car, enraged and out of control, shooting without warning at the first person he saw leaving the van was not reasonable under the circumstances.
The sixth Kyle factor is the physical size, strength and weaponry of the officers as compared to the suspect. Here, the perpetrators were out-manned and out-gunned. Officer Ponseti had no reason to believe that his back-up was insufficient to stave off the perpetrators' assault, particularly since one of the perpetrators had fled on foot and there was no indication that the robber had fired his weapon or used anything more than the threat of force in the three reported armed robberies.
The final factor is the exigency of the moment. Officer Ponseti knew or should have known that provocation of an exchange of gunfire could harm innocent bystanders or hostages, if any. He knew or should have known that the Covenant House van had likely been stolen, and should have been aware of the possibility that its original occupants were being held. He was in a residential area, where stray gunfire could enter neighboring homes.
These factors argue in favor of the exercise of caution, and employing those tactics tending to diminish the likelihood of gunfire. We conclude that Officer Ponseti did not act reasonably under the circumstances, and the trial court did not err in holding him liable under Louisiana's duty/risk standard of negligence for Ms. Stroik's injuries. Officer Ponseti offered no credible evidence that his actions were reasonable under the circumstances. *1351 Chief Armbruster's testimony clearly provides evidence of unreasonableness. The violations of standard police procedure under the particular circumstances of this case to which Chief Armbruster testified constitute breach of Officer Ponseti's duty of care.
Clearly, Officer Ponseti's conduct was the cause in fact of Ms. Stroik's serious injury. The critical test in Louisiana is phrased in terms of the "ease of association" which melds policy and foreseeability into one inquiry: Is the harm which befell the plaintiff easily associated with the type of conduct engaged in by the defendant? In this case, violation of the training guideline to take cover and not to enter the kill zone coupled with Officer Ponseti's failure to call out or otherwise warn of his intent to escalate the situation into a fire fight were the legal causes of Ms. Stroik's injury, and but for his actions she would not have been shot. Fowler v. Roberts, 556 So.2d 1,5 (La.1989). The essence of the legal cause inquiry is whether the risk and harm encountered by the plaintiff fall within the scope of protection of the duty. While the notion of taking cover initially is for the benefit of the police officer, it also operates to protect innocent bystanders. To come out of a police car, enraged and with pistol blazing, is dangerous not only for the police officer, but for all those within the ambit of the confrontation. This action not only endangers those innocents, like Ms. Stroik, who are shot by the police officer, but also escalates the likelihood that the perpetrator will open fire indiscriminately. To the extent that the defendant's actions had something to do with the injury Ms. Stroik sustained the test of a factual, causal relationship is met. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, 622 (1972); Faucheaux, supra, 615 So.2d at 292. Officer Ponseti's negligent conduct is a cause in fact of Ms. Stroik's injury since it was a substantial factor in bringing about that injury. Fontenot v. Fontenot, 93-2479 (La.4/11/94), 635 So.2d 219; Dixie Drive It Yourself System New Orleans Co. v. American Beverage Co., 242 La. 471, 482, 137 So.2d 298, 302 (La.1962).
This assignment of error is without merit.
THIRD ASSIGNMENT OF ERROR: The trial court's judgment on the merits is against the clear weight of the evidence.
Appellants suggest that this Court adopt as its standard of review the "clear weight of the evidence." It is well established that the standard of appellate review in this state is the manifest error standard.
We are instructed that before a fact-finder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts[4], not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745.
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.... When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings;... [Where] a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable *1352 factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error .... where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
Applying this standard, we find no manifest error in the trial judge's rejection of Officer Ponseti's version(s) of the shooting. The record as a whole supports the trial court's judgment finding that Officer Ponseti breached his duty to Ms. Stroik to act as a reasonable police officer under the totality of the circumstances that presented themselves on the evening of 27 October 1989, and that this breach of duty was a legal cause of her injury.
This assignment of error is without merit.
FOURTH ASSIGNMENT OF ERROR: The trial court erred in disregarding the uncontroverted evidence that the robber was pointing a gun at Officer Ponseti at the time the officer opened fire.
Officer Ponseti was the only witness to testify that Johnson was pointing his gun at Officer Ponseti when the officer opened fire. The trial judge reasonably chose, for reasons discussed herein, to discredit the officer's testimony. Under the standard of the Rosell and Canter cases, that credibility determination is not manifestly erroneous or clearly wrong, but is amply supported by the record taken as a whole. Officer Ribet testified that after he heard the first shot he looked around the van and peripherally saw Johnson with his arm around Ms. Stroik, holding a dark object in his hand. This testimony does not support Officer Ponseti's claim. This assignment of error is without merit.

CONCLUSION
Based upon our review of the record as a whole, and accepting the trial court's credibility choices as wholly reasonable and supported by that record, we find no manifest error in the judgment rendered by the trial court, and affirm.
AFFIRMED.
SCHOTT, Chief Judge, dissents.
I respectfully submit that this is a classic example of the hard case producing bad law. Anyone who considers the facts of this case is bound to sympathize with this innocent, unfortunate plaintiff who was the victim of a terrible accident. But neither the facts nor the law support the imposition of fault on the part of Officer Ponseti or the City of New Orleans. The majority opinion sends the wrong message to the police. Don't act quickly and aggressively in trying to apprehend armed and dangerous criminals because of the very rare possibility that one of them might turn out to be an innocent hostage! This kind of a rule ties the hands of the police and imperils the safety of the general public.
The majority opinion contains statements of fact that are not only contrary to the evidence, but in some instances, contrary to the findings of the trial judge.
First, the statement is made in the majority opinion: "Officer Ponseti at that time [when the robber and the plaintiff exited the van] did not know whether Ms. Stroik was a suspect or was armed." This suggests that Ponseti had some reason to believe that the plaintiff was not one of the robbers. All the evidence and the findings of the trial judge establish that all of the policemen who were in pursuit of the robbers thought that all four occupants including plaintiff were robbers.
Next, my colleagues attach great significance to the fact that Ponseti appeared angry and enraged according to Brother Stroik, as if this demonstrates some sort of substandard or unprofessional behavior on Ponseti's part. Certainly he was angry. He rightfully thought that these four had just committed three armed robberies and led the police on a life threatening chase through the City. Who wouldn't be angry and enraged? Perhaps some robot would not be, but any reasonable policeman or citizen would be.
Next, the opinion seems to suggest something sinister about Ponseti attempting "to handcuff the seriously wounded woman." This presupposes that Ponseti should have known in these few seconds the extent to which she was injured and it ignores the fact *1353 that Ponseti thought she was one of the three dangerous robbers he was trying to arrest.
In a footnote the opinion states that "it is immaterial whether [plaintiff] or [the robber] was first to exit the van." That comment is interesting because one of the crucial factual underpinnings of the trial judge was that the plaintiff exited first. Of course, there is absolutely no evidence whatsoever to support this conclusion of the trial judge.
The majority opinion makes much over Ponseti's "conflicting sworn statements regarding critical aspects of the shooting ..." I differ with that characterization. The conflicts were not critical at all. They were normal differences about details which emerge from statements given at various times about something that took place in a few seconds under circumstances where Ponseti was in a state of intense apprehension and excitement. One of the biggest problems with the findings of the trial judge and the opinion of my colleagues is their willingness to break down these few seconds in which this entire scenario took place into micro-seconds and to measure each thought and act, each blip, as though Ponseti had this opportunity at the time. I respectfully submit that this approach is unrealistic and unfair. It necessarily yields a result that is impractical and unworkable placing impossible duties on a policeman in these circumstances and discouraging him from performing the duty which the public expects of him.
Much is made of Ponseti's training in street survival and armed confrontation concerning taking cover and avoiding the "kill zone." All of this is designed to protect the policeman; it is not designed to protect the person thought to be a robber. In order to impose liability under a duty-risk analysis, the risk must be one which the duty is designed to protect against. When Ponseti failed to follow these street survival teachings he placed himself at risk and may be said to have acted courageously, even heroically, or foolhardily depending on one's point of view, but that conduct was not a breach of any duty toward these robbers of whom he reasonably thought plaintiff was one.
The majority's characterization of Ponseti's testimony as "materially inconsistent, argumentive and evasive" overlooks what has already been said to the effect that hardly anyone can break down into microseconds his thoughts and acts which took place in an excitement charged ten second period several years ago without inconsistencies. I flatly disagree that such inconsistencies were material. On the contrary they were normal and to be expected of anyone. They simply do not support the imposition of liability on him.
As far as his testimony being argumentative and evasive, whose wouldn't be? At great risk to himself he apprehended what he reasonably thought to be three dangerous thugs who had just been terrorizing and endangering innocent citizens. Now, because one of the thought-to-be thugs turns out to everyone's surprise to be an innocent victim, he is called upon to defend his actions. If plaintiff had in fact been one of the robbers Ponseti would have been cited for valor and none of this hair-splitting analysis of his thoughts and actions would have been made.
When Ponseti and the other officers were chasing the van, they could not possibly know how many, if not all, of the occupants were armed. Yet, the majority opinion makes much over a so called contradiction between a statement by Ponseti that one of the reports he had indicated that a white suspect was armed while he said two hours after the incident that the two black suspects were armed. That is not a contradiction at all. The only information the police had during the chase was from the citizens who had been robbed. Not until after the shooting did Ponseti and two other policeman know that the two white persons were victims of a kidnapping by the robbers and only then could they know that the victims were not armed.
The majority relies heavily on the testimony of Chief George Armbruster, called by plaintiff as an expert witness. It is interesting that the trial judge in extensive reasons for judgment did not mention Armbruster. This establishes that his opinions did not influence the trial court and provided no part in the court's ultimate judgment. An appellate court should review the judgment of the trial court for error. Unless a de novo review *1354 is being conducted, which this is not, the appellate court should not search the record to find evidence to support a result when the trial court apparently disregarded that evidence.
In any event, my colleagues, after reviewing Armbruster's testimony, make the statement that he found that Ponseti's actions were improper. So what? Armbruster was not the judge. Whether Ponseti's conduct was improper, unreasonable, or tortious was exactly what the judge was supposed to decide. Perhaps that is why she ignored his testimony in her reasons.
In the application of the law my colleagues are in clear error. They correctly look to Mathieu v. Imperial Toy Corp., 646 So.2d 318 (La.1994) for guidance, but in applying factors first set out in Kyle v. City of New Orleans, 353 So.2d 969 (La.1977), and applied in Mathieu they fall into error.
In discussing the first Kyle factor, they mistakenly impute knowledge to Ponseti that he knew these robbers weren't so bad because they hadn't shot any of the victims they held up and had not battered them. I do not agree that the robber who threatens the victim with a gun, but didn't shoot is not so bad. He is a dangerous criminal.
To discuss the next Kyle factor my colleagues say that Ponseti was not at such great risk because he knew the robbers hadn't injured any of the victims and he had plenty of back-up. I do not subscribe to the theory that armed robbers who did not have to shoot their victims in order to take their property are not a great risk and a danger to arresting officers. Ponseti did not have "ample" back-up. He was the first officer in line to confront what they all thought were three dangerous robbers.
For the next Kyle factor my colleagues acknowledge that the offense was serious, but they once again fault Ponseti for failing to follow the irrelevant and inapplicable take-cover-kill-zone principles.
Next, my colleagues reach the unsupported and clearly erroneous conclusion that likelihood of escape was not high. In a few split seconds after the van stopped, the door opened and one robber ran off pursued by Ponseti's colleagues. A split second later plaintiff and another robber popped out. If Ponseti had done what the majority says he should, i.e., hesitate, take cover, call out warnings, etc. all the thought-to-be robbers would have been gone.
As for the fifth Kyle factor while my colleagues fault Ponseti for failing to use existing alternative methods, they do not say what these are. Surely, we do not expect a policeman in hot pursuit of four armed thugs to hesitate, call out warnings, cower behind vehicles, and ultimately allow them to escape. No! The public expects the policemen to be brave and aggressively pursue such hoodlums even at risk to himself and even though someone may get hurt.
As to the sixth Kyle factor, there is simply nothing to support my colleagues' statement that the perpetrators were out-manned and out-gunned. Everyone thought there were four robbers and no one knew how many guns they had. How many guns the police had should not matter under the approach taken by the majority opinion because they fault Ponseti for using his gun.
Finally, my colleagues state that the last Kyle factor, the exigency of the moment, was not met because Ponseti "should have been aware of the possibility that [the van's] original occupants were being held." This is contrary to the findings of the trial judge and every bit of evidence in this case. It is simply unfair to suggest that Ponseti or any other policeman on the scene had any doubt that plaintiff was one of the robbers.
From the standpoint of the facts, the judgment of the majority opinion is not supported by the record and the judgment of the trial court is manifestly erroneous. The majority opinion is also wrong as a matter of law in that it fails to follow the law as pronounced in Kyle and Mathieu. If the majority opinion were correct in this case, the police would be discouraged and prevented from doing what is expected of them when called upon to apprehend dangerous criminals in flight. This case sends the wrong message to the police and the public who employ them to perform this necessary, albeit dangerous, duty.
*1355 I would reverse the judgment of the trial court and dismiss plaintiff's case.
NOTES
[1] The transcript of the federal civil rights trial testimony was admitted as evidence by the trial court as Plaintiff's Exhibits 7 and 7a.
[2] Because of our conclusion concerning Officer Ponseti's breach of duty under Louisiana's duty-risk negligence standard, it is immaterial whether Monica or Johnson was first to exit the van.
[3] The NOPD gave Officer Ponseti a Medal of Merit citation, according to which the driver of the van was using a female in front of him as a shield. Morales testified that he was not the source of that version of the incident.
[4] See, LSA-Const. Art. 5, section 10(B).