699 So.2d 1072 (1997)
Monica STROIK
v.
Wilbur PONSETI, Warren Woodfork, The City of New Orleans, and Royal Insurance Company of America.
No. 96-C-2897.
Supreme Court of Louisiana.
September 9, 1997.
Rehearing Denied October 10, 1997.
*1074 Avis M. Russell, Franz L. Zibilich, Annabelle H. Walker, New Orleans, for Applicant.
Dennis P. Couvillion, Metairie, for respondent.
Gerald Joseph Nielsen, Metairie, for amici curiae Louisiana Municipal Ass'n and Louisiana Ass'n of Chiefs of Police.
KIMBALL, Justice.[*]
We granted certiorari in this case to review the negligence issue surrounding a police officer's actions in approaching and apprehending an armed and dangerous suspect, which ultimately led to the wounding of a hostage by a police officer. Because we find the officer's actions which led to plaintiff's injuries were reasonable under the circumstances, we reverse the court of appeal decision which affirmed the trial court's judgment in favor of the plaintiff.

FACTS AND PROCEDURAL HISTORY
On October 27, 1989, Christopher Stroik and his sister Monica were the victims of a car jacking in the New Orleans French Quarter. The incident occurred as the two were preparing to enter a light blue Chevrolet Astro van. As Christopher opened the passenger-side door for his sister, two black men approached, one of whom brandished a gun, and ordered them both into the vehicle through the opened door.[1] Once inside, the robbers directed Christopher to drive while they proceeded to take everything of apparent value from the Stroiks. Afterwards, the gunman instructed Christopher to stop the van and he took over the wheel. Christopher moved to the front passenger seat, and Monica remained in the rear seat with the younger assailant.
From this point, the gunman navigated the van into the Garden District-Uptown area of the city where he committed three armed robberies. Each time, he would slow the vehicle behind his intended victim, then stop and rob the pedestrian at gunpoint. The robberies culminated in the robbery of a gentleman walking his dog near Audubon Park on St. Charles Avenue. Shortly after that incident, police units, informed of armed robberies perpetrated from a blue Astro van containing two black and two white persons with at least one believed to be armed, caught sight of the vehicle and began hot pursuit. Officer Darryl Ribet's marked unit immediately followed the robbers, and three other units eventually provided support behind Ribet, including a unit driven by Officer Kevin Balancier with his partner Officer Wilbur Ponseti. Tailed by police units, the gunman began to pick up speed down the divided boulevard. Turning from St. Charles Avenue, the gunman ran over a pedestrian on Milan Street and proceeded to turn against the flow of traffic on a one-way street heading back downtown. The van eventually came to a stop at the intersection of Baronne and Constantinople Streets. Officer Ribet stopped his police unit to the left of the van, and Officer Balancier stopped in the intersection to the van's right rear side.
The younger assailant escaped through the sliding door as the van was slowing and fled toward the front of the van in the direction of downtown. Officer Balancier gave chase to the younger perpetrator, eventually apprehending him several blocks away. At the time Officer Balancier exited the police unit to pursue the fleeing assailant, Officer Ponseti also exited. It is from this point until the gunman and Monica were shot by Officer Ponseti that the facts are disputed.
In a bench trial, the district court found that after the younger assailant fled and the van completely stopped, the gunman went to the rear seat, grabbed Monica, and "held her and pushed her out of the right sliding van door in front of him." The district court found the evidence demonstrated Monica was struck by Ponseti's first shot almost immediately as she exited the van door. As a consequence of that first shot, the trial judge noted that Christopher, still seated in the front seat and facing forward, ducked his *1075 head in an instinctive reflex from the shot. Thereafter, the trial judge found that a brief pause took place before Ponseti fired several shots at the gunman, including a fatal shot to the right temple, before the gunman could fire even a shot. The district court disregarded as not credible evidence the testimony of both Officers Ponseti and Ribet that the gunman was pointing his gun at Officer Ponseti before the shooting began. From the pause in the shots, as testified to by Christopher, the trial judge reasoned the gunman "probably [was] still inside the van" when Monica was shot.
Monica sustained severe injuries as a result of the gunshot wound necessitating multiple surgeries. On October 17, 1990, Monica filed a Petition for Damages in the Civil District Court for the Parish of Orleans against Ponseti, police superintendent Warren Woodfork, the City of New Orleans, and Royal Insurance Company, the automobile liability insurer.[2] Essentially, the lawsuit alleged Ponseti's actions were negligent under state law because it was an unnecessary use of excessive deadly force which departed from proper police procedure. The plaintiff alleged Woodfork was liable as well for failure to adequately train and screen Ponseti, and for otherwise implementing or condoning an atmosphere of lawlessness in the New Orleans Police Department (NOPD). Finally, the plaintiff named the City as a defendant vicariously liable for the acts of Ponseti and Woodfork.
The same day plaintiff filed her state law claims in Civil District Court, she filed a Complaint for Damages for Deprivation of Civil Rights under 42 U.S.C. §§ 1983 & 1988 in the United States District Court for the Eastern District of Louisiana against Ponseti and Woodfork. Plaintiff's federal complaint alleged Ponseti's actions demonstrated a callous disregard for her life and constituted a deprivation of her constitutionally guaranteed civil rights by directing excessive deadly force against her when he knew or should have known she committed no crime. As to Superintendent Woodfork, plaintiff's complaint essentially tracked her state petition with regard to the screening and training of Ponseti and the policies and procedures of the NOPD. In April 1991, plaintiff amended her federal complaint to additionally allege that in the incident in question, Ponseti intentionally fired at the gunman, but that in striking the plaintiff, Ponseti was grossly and outrageously negligent to such an extent that his conduct was actionable under Section 1983.
In April 1992, approximately two weeks before her federal jury trial was to begin, plaintiff filed a second amending complaint in federal court seeking to add the City to the federal case and to append the state negligence claims to the federal claims under the federal court's pendant or supplemental jurisdiction. The federal magistrate judge[3] issued the following order denying the plaintiff's tardily filed amendment:
DENIED. The amendment comes too late and plaintiff has not offered any reason why the amendment could not have been sought at an earlier stage of the litigation. The amendment adds a party and a new theory of liability and would necessarily upset the current trial date. Plaintiff will not be prejudiced by the denial of the amendment because he [sic] has a longpending state court case in which he [sic] has asserted the state law claims included in the proposed amendment.
Furthermore, the Magistrate Judge noted that if the amendment were allowed, the state law claims would necessarily predominate over the federal law claims.
The case proceeded to trial before a sixmember jury on May 4-5, 1992. The magistrate judge dismissed Superintendent Woodfork on a motion for judgment as a matter of law, but denied the motion as to Ponseti. The jury returned a verdict for the plaintiff and against Ponseti in the amount of $600,000, but rejected plaintiff's claim to punitive damages. Ponseti again moved for judgment as a matter of law, or, alternatively, for a *1076 new trial, arguing that his conduct was objectively reasonable under the circumstances and was not an excessive use of force. That motion was denied and Ponseti appealed to the United States Court of Appeals for the Fifth Circuit.
The sole issue before the Fifth Circuit was whether Ponseti's use of force was objectively reasonable "in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." Stroik v. Ponseti, 35 F.3d 155, 158 (5th Cir. 1994) (citing Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989)). Looking to the totality of the circumstances, and particularly considering whether the gunman posed an immediate threat to the safety of officers or others, the Fifth Circuit reversed the trial court's denial of Ponseti's motion for judgment as a matter of law.[4] Crucial to the Fifth Circuit's conclusion was its finding as uncontroverted the fact that at the time Ponseti came around the rear of the van, the gunman was pointing a gun at him. Id. at 158. Although the court recognized an evidentiary dispute as to whether the gunman and Monica were standing or were on the ground as Ponseti rounded the van, the court found that in either case the gunman was pointing a gun at Ponseti. Id. at 158 & n. 5. The court emphasized there was no evidence of record from which the jury could have concluded otherwise. Id. at 158. Therefore, the Fifth Circuit held that Ponseti had probable cause to believe the suspects posed a threat of serious physical harm to him, or to others if the suspects were allowed to flee. Thus, the court concluded the officer was justified in using deadly force.
After the federal trial, the plaintiff proceeded more actively with her state negligence cause of action. In May 1995, the City filed a peremptory exception of res judicata, seeking to attach preclusive effect to the federal judgment so as to bar plaintiff from proceeding further with her state case. The trial judge denied the exception. The City took writs on this interlocutory ruling to the court of appeal, which denied review. The case proceeded to trial in July 1995. After a bench trial, the district court held in plaintiff's favor. In the summary of its findings, the district court stated:
It is of course much easier for this Court from the safe confines of the courthouse to second guess Ponseti's actions. The law recognizes this concept; Ponseti need not pick the best method in apprehending a criminal, but he must pick a good method based upon his experience and training. In this case, Ponseti's actions were contrary to his training and police procedure. He failed to maintain cover, failed to assess the situation and failed to use verbal commands. As soon as he saw Johnson and Stroik exiting the vehicle, he started shooting. This reaction is simply not acceptable. The Court finds liability on the part of Ponseti and his employer, the New Orleans Police Department.
Thus, the district court entered judgment for Monica and against Ponseti and the City in the amount of $594,084.11, which included general damages, medical expenses, and future medical expenses, as well as all costs of the proceedings.
A divided panel of the fourth circuit court of appeal affirmed. Stroik v. Ponseti, 96-0842 (La.App. 4 Cir. 11/6/96), 683 So.2d 1342, and we granted certiorari to consider the negligence issue. 96-2897 (La.2/7/97), 688 So.2d 483.

LAW AND DISCUSSION

Res Judicata
Before proceeding to the merits of the negligence issue, this court, as a threshold concern, must address whether the federal judgment acquired preclusive effect as to plaintiff's state negligence cause of action as urged on appeal by the defendants. Both plaintiff's state petition and federal complaint were filed in the respective jurisdictions on the same day in October of 1990. Plaintiff's federal case proceeded to judgment first, and *1077 plaintiff's effort to amend her federal complaint to add her state claims was refused by the federal court because, inter alia, leave for the second amendment was tardily requested. However, we find the federal magistrate judge's order contained a statement which we construe as a reservation of plaintiff's right to later proceed with her state case.
In its order denying plaintiff leave to file a second amendment to her federal complaint, the magistrate judge stated, "[p]laintiff will not be prejudiced by the denial of the amendment because he [sic] has a long-pending state court case in which he [sic] has asserted the state law claims included in the proposed amendment." For the purpose of res judicata, when the court in the first action has expressly reserved the plaintiff's right to maintain the second action, the first action fails to acquire the authority of the thing adjudged as to the second action. Terrebonne Fuel & Lube, Inc. v. Placid Refining Co., 95-0654, p. 13 (La.1/16/96), 666 So.2d 624, 632; RESTATEMENT (SECOND) OF JUDGMENTS § 26(b) (Preclusive effect fails to attach to the first action if "[t]he court in the first action has expressly reserved the plaintiff's right to maintain the second action.").
Although the "mere refusal of the court in the first action to allow an amendment of the complaint ... is not a reservation by the court within the meaning of [§ 26(b)]," RESTATEMENT (SECOND) OF JUDGMENTS § 26 cmt. b (emphasis added), we find the federal magistrate judge's order did not "merely refus[e]" to allow plaintiff's second amendment. Instead, the order expressly recognized the existence of plaintiff's longpending state case and reserved plaintiff's right to bring her state case subsequent to the federal action. Thus, we reject the defendants' argument that the instant case should be dismissed as res judicata.

Negligence Issue
In order to determine whether liability exists under the facts of a particular case, this court has adopted a duty-risk analysis. Under this analysis, plaintiff must prove:
(1) the conduct in question was the causein-fact of the resulting harm;
(2) defendant owed a duty of care to plaintiff;
(3) the requisite duty was breached by the defendant;
(4) the risk of harm was within the scope of protection afforded by the duty breached.
Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289, 292 (La.1993); Mart v. Hill, 505 So.2d 1120 (La.1987). Under the duty-risk analysis, all four inquiries must be answered affirmatively for plaintiff to recover on a negligence theory. Faucheaux, 615 So.2d at 292; Mathieu v. Imperial Toy Corp., 94-0952, p. 4 (La.11/30/94), 646 So.2d 318, 322.
Cause-in-fact is generally a "but for" inquiry. If the plaintiff probably would not have sustained the injuries but for the defendant's conduct, such conduct is a causein-fact. Faucheaux, 615 So.2d at 292 (citing Fowler v. Roberts, 556 So.2d 1, 5 (La.1989)). To the extent the defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met. Id. Under the instant set of facts, it is clear Officer Ponseti's actions in approaching the suspects, which ultimately led to the fatal shooting of the gunman and Monica's gunshot wound, were a cause-in-fact of Monica's sustained injuries.
Whether a duty is owed in this case is a question of law. Mundy v. Department of Health & Human Resources, 620 So.2d 811, 813 (La.1993); Faucheaux, 615 So.2d at 292. This court has held the duty owed by police officers when approaching a subject prior to disarming him or her is one of reasonableness under the totality of the circumstances.[5]Mathieu, supra, 94-0952, p. 6, *1078 646 So.2d at 323; Kyle, supra, 353 So.2d at 973.
The next inquiry in the duty-risk analysis is whether the duty owed by the officer to the subjects was breached. In Mathieu, this court held the reasonableness of the officers' actions under the particular circumstances of a case should be determined through consideration of the factors enunciated in Kyle v. City of New Orleans, 353 So.2d 969 (La.1977), a Fourth Amendment case which articulated a standard of conduct for police officers to follow when making an arrest. The factors in Kyle, which we applied to a duty-risk analysis in Mathieu to determine whether the officers acted reasonably under the circumstances, are as follows:
(1) the known character of the arrestee;
(2) the risks and dangers faced by the officers;
(3) the nature of the offense involved;
(4) the chance of the arrestee's escape if the particular means are not employed;
(5) the existence of alternative methods of arrest;
(6) the physical size, strength, and weaponry of the officers as compared to the arrestee; and
(7) the exigency of the moment.
Whether a defendant breached a duty owed is a question of fact. Mundy, supra, 620 So.2d at 813. After carefully examining all of the evidence contained in the record, we find the totality of the circumstances surrounding the shooting in this case clearly demonstrates the lower courts were manifestly erroneous in holding Officer Ponseti breached his duty of reasonable care.
The first Kyle factor is the known character of the subject. The information available to the officers pursuing the subject vehicle and to Officer Ponseti was that armed robberies had been committed from a blue Astro van containing two white and two black persons, at least one of whom was armed with a gun. That information was transmitted in the advent of a third armed robbery on St. Charles Avenue, a high-speed chase down the divided boulevard, and the hit-and-run of a pedestrian on Milan Street. The appellate court majority minimized this factor by observing the gunman "had not fired his pistol in the three armed robberies, nor had the perpetrator battered any of his victims," Stroik, 96-0842, p. 13, 683 So.2d at 1350. However, we find the information dispatched to the officers in conjunction with the assailants' actions in the high-speed chase show the known character of the subjects to be armed and dangerous. As Chief Judge Schott noted in his dissent in the fourth circuit opinion in this case, armed robbers who do not have to shoot their victims in order to take their property are still dangerous criminals.
The second Kyle factor is the risks and dangers faced by the officers. The officers knew the subject vehicle contained at least one armed perpetrator. The officers were therefore faced with the risk of confronting armed and dangerous suspects at night. These subjects were attempting escape through a dangerous chase, which resulted in the hit-and-run of a pedestrian. Moreover, after the car chase, one assailant immediately fled the scene with Officer Ponseti's partner in pursuit on foot. The risk faced by these officers and the public was extreme and imminent.
The third Kyle factor is the nature of the offense involved. In this case, the officers were responding to reports of multiple armed robberies committed by mobile perpetrators. In addition, the suspects had already severely injured a pedestrian while attempting to flee. As in Mathieu, because the complained of behavior involved a weapon, the nature of the offense must be characterized, and the officers had every reason to treat it, as serious and potentially life-threatening.
The fourth Kyle factor is the chance of the subjects' escape if the particular means are not employed. The court of appeal majority determined the likelihood of escape in this case was not high. We disagree. By their actions in the high-speed chase, the subjects displayed a propensity for escape. Undisputed record evidence showed one subject attempted escape followed by Officer Ponseti's partner, and given the incident took place *1079 in a mostly residential area at night, the likelihood of escape was not minimal.
The fifth Kyle factor is the existence of alternative methods. Expert testimony reflected that alternative methods for confronting the suspects in this situation, in which escape of armed suspects was high, did exist. Although the court of appeal did not delve into such reasonable alternatives, the district judge intimated the departure from proper police procedure centered on the failure to use or maintain cover or issue verbal commands. In Mathieu, we recognized the existence of other available alternative methods does not, in and of itself, render the method chosen unreasonable. Mathieu, 94-0952, p. 9, 646 So.2d at 324. Consequently, the scope of the officers' duty to act reasonably under the circumstances does not operate to restrict the officers to employing only the best of several available alternatives, or the least intrusive. Instead, Officer Ponseti was charged with choosing a reasonable course under the circumstances which he faced. Therefore, while alternatives did exist, there was nothing unreasonable about the alternative elected by the officer under these circumstances.
The sixth Kyle factor is the physical size, strength, and weaponry of the officers as compared to the suspect. With three police units ultimately arriving at the scene of the shooting, the officers enjoyed a tactical advantage against the armed suspects. However, the officers did not know whether more than one, or even all, of the suspects were armed.
The seventh and final Kyle factor is the exigency of the moment. The exigent circumstances in this case are represented by events which occurred approximately ten seconds after the younger assailant fled the van and lasted literally split-seconds. In addressing this issue, it is necessary for us to address two factual findings made by the trial court which bear heavily on the reasonableness of Officer Ponseti's actions. The trial court found Monica was shot as she emerged from the van, a slight pause occurred, then the gunman, who "probably" was still in the van when Monica was shot, emerged and was shot. In addition, the trial court implicitly found, by its rejection of Ponseti and Ribet's testimony to the contrary, that the gunman was not pointing his gun at Officer Ponseti when he exited the van.
Before proceeding to a consideration of the exigency of the moment, it should be noted the court of appeal should not upset the factual findings of a trial court absent manifest error or unless clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where two reasonable views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State, 617 So.2d 880, 882-83 (La.1993) (emphasis added). Although deference to the factfinder should be accorded, the court of appeal and this court have a constitutional duty to review facts, Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, p. 8 (La.7/5/94), 639 So.2d 216, 221(La.1994); therefore, it is not the case that a trial court's factual determinations "cannot ever, or hardly ever, be upset." Id.
Supported solely by Christopher's testimony that he heard a pause between shots, the trial court found Monica must have emerged from the van before the gunman. We find the trial court's conclusion, derived only from circumstantial evidence, is not a "reasonable" view of the evidence. The only significant direct evidence on the suspects' emergence from the van came from the testimony of Monica, Ponseti, and Ribet. Monica testified she closed her eyes when the gunman grabbed her and attempted his escape from the van. She was unable to affirmatively state which of them emerged first or which was shot first. She did, however, testify that she and the gunman "exited together `cause he was holding me." This is consistent with Officer Ponseti and Ribet's testimony that Monica and the gunman were touching as they exited together from the van, almost as one. When the evidence relied upon is solely circumstantial, that evidence, taken as a whole, must exclude every other reasonable hypothesis with a fair amount of certainty. Lacey v. Louisiana Coca-Cola Bottling Co., 452 So.2d 162, 164 *1080 (La.1984). In this case, the circumstantial evidence which the trial court found persuasive goes against the clear weight of the direct evidence. Therefore, the district court's factual finding that Monica and the gunman did not emerge together is not a reasonable view of the evidence and was thus manifestly erroneous.
We further find the clear weight of the evidence refutes the trial court's implicit finding that the gunman did not have his gun extended toward Officer Ponseti as he exited the van. The trial court stated in its reasons that it disregarded Officer Ponseti's testimony as not credible evidence. Officer Ribet testified under lengthy cross-examination that he saw a gun extended toward Officer Ponseti simultaneous to Ponseti firing his first shot, but the district judge rejected Ribet's testimony reasoning that his view of the shooting was peripheral and obstructed. After a careful review of the record evidence, we find the gunman was armed and pointing his gun at Ponseti when he exited the van.
Officer Ribet continually maintained at trial that while Officer Ponseti fired his first shot, he peripherally saw a gun extended from the van's exit area toward the officer. Certainly, this was a split-second event. Moreover, the plaintiff introduced no evidence to contradict this fact. In fact, both Monica and Christopher's testimony as well as other objective evidence lend support to and are consistent with Ribet's testimony. Christopher's testimony revealed he did not turn around after the driver passed from the front to the rear seats, and he ducked down when the shooting began. However, Christopher did testify that as the driver got out of the driver's seat and headed toward the rear sliding door, he could see a gun in the driver's hand. Likewise, Monica testified that when the van came to a stop, the driver pointed a gun at her and ordered her out of the van. Monica resisted and closed her eyes, forcing the driver to take her, with his free hand, and force her out the sliding door. Additionally, the autopsy diagram of the gunman's wounds lends objective support to this point, in that the diagram depicts the gunman with wounds which only could have been incurred if he was turned slightly toward the officer when the shooting began. Furthermore, and most importantly, the driver who forced Monica out of the van and who was killed instantly by Ponseti's shot to the temple was found on the ground with a gun in his upraised right hand.
The burden of proof consists of two elements, the burden of persuasion and the burden of producing evidence. "Normally, the party seeking redress bears the burden of persuasion, and that of producing sufficient evidence to prove each element of his or her claim." Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law, p. 173, § 8-1. See also 2 McCormick on Evidence §§ 336-39 (John W. Strong ed., 4th ed.1992). It is Monica's burden to produce evidence proving Ponseti acted unreasonably. While the trial judge discredited Ponseti and Ribet's testimony on this issue, "[t]he disbelief of witnesses is a valid ground for refusing to consider their testimony in formulating a conclusion on the facts, but it cannot be used as a means to supplant affirmative proof where none exists and thus afford the basis for a judgment." New Orleans & N.E. R. Co. v. Redmann, 28 So.2d 303, 309 (La.1946). See also, Succession of Pigg, 228 La. 799, 84 So.2d 196, 198 & n. 1 (1955). Thus, a trial court can disregard a defense witness's testimony, but the court's refusal to consider such testimony cannot act as affirmative proof in favor of the plaintiff, especially when there exists other evidence which lends support to the disregarded testimony. Even disregarding Ponseti and Ribet's testimony, the remaining evidence on this issue supports Ponseti's assertion that the gunman was pointing his gun at Ponseti when he exited the van, and furthermore the plaintiff failed to offer any proof to the contrary.
Given the above facts, we find the exigency of the circumstances was severe. Officer Ponseti and the other officers were responding to a series of three armed robberies. It was reported there were four suspects, two black, two white, driving a blue Astro van, and at least one of the suspects was armed. When the police officers engaged the suspects, they led the officers on a high speed chase down a heavily populated street, had *1081 struck one pedestrian with the van, and had turned the wrong way onto a one-way street. As the van slowed, one of the suspects fled on foot and was followed by a police officer. When the van came to a complete stop, two figures emerged from the van together, one with a gun in hand pointed at Officer Ponseti.
Having found the trial court was manifestly erroneous in its factual determinations and in light of our application of the Kyle factors, we find the plaintiff failed to prove by a preponderance of the evidence that Officer Ponseti's actions on the night of October 27, 1989 were unreasonable. Thus, we hold the lower courts erred in concluding Officer Ponseti breached his duty owed to the plaintiff.
A negative answer to any of the inquires of the duty-risk analysis results in a determination of no liability. Mathieu, 94-0952, p. 13, 646 So.2d at 326. Therefore, we pretermit discussion of the remaining questions posed by the duty-risk analysis.

CONCLUSION
For these reasons, the decision of the court of appeal affirming the judgment in favor of the plaintiff is reversed.
Reversed.
LEMMON, J., concurs.
NOTES
[*] Marcus, J., not on panel. See Rule IV, Part 2, § 3.
[1] Trial testimony revealed the gunman, known as Paul Johnson, appeared older and shorter than the second assailant. In addition, Christopher's testimony revealed the younger perpetrator may have been armed as well, with a weapon concealed in his breast pocket.
[2] The district court granted Royal Insurance Company's Motion for Summary Judgment, dismissing the insurer from the case with prejudice, on March 12, 1992.
[3] The record reflects the parties consented to proceed before the magistrate judge assigned to the case. See 28 U.S.C. § 636(c).
[4] The Fifth Circuit noted that to reverse the denial of a judgment as a matter of law, the facts and inferences must point "so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." Stroik, 35 F.3d at 157 (citing Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969)(en banc)).
[5] Certainly, if Officer Ponseti knew or had reason to know the plaintiff was a hostage, our consideration of the duty owed and whether or not it was breached would be very different. However, because Officer Ponseti reasonably believed the plaintiff was a suspect, the duty he owed the plaintiff as well as the actual perpetrators was to approach them in a reasonable manner under the circumstances. That Officer Ponseti believed Monica was a suspect and not a hostage is supported by the fact that Ponseti handcuffed Monica after he shot her.