755 So.2d 942 (1999)
Karl Coty McDANIEL, Plaintiff-Appellant,
v.
Ernest GREEN, et al., Defendants-Appellees.
No. 99-1087.
Court of Appeal of Louisiana, Third Circuit.
December 22, 1999.
Writ Denied March 24, 2000.
*944 Richard W. Vidrine, Ville Platte, for Karl Coty McDaniel.
John Fayne Wilkes, III, Lafayette, for Ernest Green et al.
Before COOKS, PETERS, and PICKETT, Judges.
PETERS, J.
Karl Coty McDaniel brought this action to recover damages for injuries he sustained in a May 7, 1997 altercation with Ernest Green, a Ville Platte, Louisiana City Policeman. In his suit, McDaniel named Green and the City of Ville Platte as defendants. The trial court's rejection of McDaniel's demands gave rise to this appeal. For the following reasons, we affirm the trial court's judgment in all respects.

DISCUSSION OF THE RECORD
On the evening of May 7, 1997, McDaniel and three other teenage friends, Travis Odom, Joseph Arnaud, Jr., and Shannon Guillory were riding around Ville Platte in Odom's blue pickup truck. Before leaving Guillory's house where they had met up, the young men placed two ice chests containing beer in the bed of the truck. At the time, McDaniel, Odom, and Arnaud were seventeen years of age, and Guillory was eighteen.
Sometime during the evening, Pierre Vidrine was also driving in Ville Platte and had stopped at a traffic signal. As he waited in his vehicle for the light to change to green, an occupant of a blue pickup truck threw a beer bottle, striking Vidrine's vehicle. Vidrine and his passengers then found Officer Green stopped in a parking lot and reported the bottle-throwing incident. As they were making their complaint to Officer Green, Odom's pickup truck passed the parking lot, and Vidrine and his passengers pointed it out as being the truck involved. Officer Green then immediately proceeded to stop Odom's truck. The traffic stop occurred at approximately 11:00 p.m.
Prior to being stopped by Officer Green, the four men in Odom's truck had been driving around Ville Platte and drinking beer for a number of hours. All four men were occupying the truck's cab with McDaniel sitting next to Odom, Arnaud next to McDaniel, and Guillory occupying the position next to the passenger door. It is undisputed that as the young men drove around and drank beer, one of them threw a bottle out the window. However, they all denied that anyone had hit the Vidrine vehicle.
After stopping the Odom vehicle, Officer Green approached it on the driver's side and promptly informed the young men he was investigating a report that someone in a pickup truck containing four white males had thrown a bottle at a car. Almost immediately after Officer Green stopped the vehicle, Lt. Michael Johnson of the Ville Platte Police Department also arrived on the scene. As Lt. Johnson approached the pickup truck on the driver's side, he detected the odor of alcohol coming from inside the cab. The officers then ordered Odom out of the truck, and Odom complied. Lt. Johnson then proceeded to have Odom perform a field sobriety test.
While the exact sequence of events is in conflict, Officer Green testified that sometime early in the investigation, he inquired of the truck occupants as to the ownership of the beer in the truck. No one responded except McDaniel, who denied any wrongdoing on the part of the group and questioned Officer Green's authority to stop them. According to Officer Green, he informed McDaniel that he was not accusing them of doing anything wrong but simply investigating a complaint. This explanation did not satisfy McDaniel, who continued to express his view of the situation in no uncertain terms. When McDaniel refused to keep quiet after being told to do so by Officer Green, the officer felt *945 McDaniel's vocal involvement was interfering with his ability to ascertain the facts concerning the bottle-throwing incident, and he asked McDaniel to exit the vehicle.
McDaniel did not dispute Officer Green's version of the verbal exchange which took place while he was in the truck. In fact, McDaniel admitted that when Officer Green told him to keep quiet, he did not comply with that instruction. Rather, he continued to inform the officer that they were not involved in the bottle-throwing incident and that the officer had no right to stop them. According to McDaniel, after he exited the vehicle, he again professed their innocence to Officer Green, who became angry and grabbed his left arm without warning. McDaniel testified that he stiffened up and attempted to pull away from the officer, and as he did, Officer Green then began hitting him with a flashlight. McDaniel asserted that, after the first blow, he fell to the ground, and Officer Green struck him at least four more times. Once Officer Green stopped hitting him, he handcuffed McDaniel, placed him in a patrol car, and transported him to the hospital.
Officer Green testified that as he attempted to question the occupants of the truck, McDaniel was belligerent, continuously interrupted him, denied any involvement in the bottle-throwing incident, and stated that Officer Green's actions in stopping them were "b___ s___." According to Officer Green, when McDaniel exited the truck, he "began to get loud and belligerent once again" and repeated that he had done nothing wrong and that the officer's actions were "b___ s___." Despite continued instructions from Officer Green to be quiet and warnings that he would be arrested if he did not stop interfering with the investigation, McDaniel continued his verbal tirade. Officer Green testified that he then informed McDaniel he was under arrest "for interfering with the duties of a police officer." The officer ordered McDaniel to turn around and put his hands on the truck. According to Officer Green, when McDaniel failed to comply, the officer grabbed McDaniel's right arm and attempted to turn him around so he could place handcuffs on him. As he attempted to handcuff him, McDaniel "jerked away," pushed him, and yelled a racial obscenity.
By this time, Officers Gab Guillory and Kent Vidrine of the Ville Platte Police Department had arrived on the scene. Officer Green testified that when McDaniel "jerked away," he stepped back, and Officer Guillory grabbed McDaniel from behind. According to Officer Green, McDaniel then pulled away from Officer Guillory, came toward him, and attempted to hit him. As McDaniel approached him, Officer Green removed his police baton from his belt loop and attempted to strike McDaniel on the shoulder in self-defense. He missed McDaniel's shoulder and struck him on the head instead. Both Officer Guillory and Officer Vidrine then grabbed McDaniel, handcuffed him, and placed him in a patrol unit. Because McDaniel was bleeding from the wound inflicted by Officer Green, the officers transported him to the Ville Platte Medical Center.
Officer Guillory testified that when he and Officer Vidrine arrived, McDaniel was already outside the truck with Officer Green. According to Officer Guillory, every time Officer Green attempted to speak, McDaniel interrupted him, getting progressively louder. When Officer Green finally informed McDaniel that he was placing him under arrest, Officer Green had not yet touched McDaniel.
Officer Guillory's testimony was basically the same as that of Officer Green, concerning what happened next. As Officer Green attempted to turn McDaniel around to handcuff him, McDaniel pulled away from him and told Officer Green, "get your f______ hands off of me you n______." Officer Guillory testified that he then grabbed McDaniel, who pulled away from him and made "an aggressive move toward Officer Green." According to Officer Guillory, Officer Green then pulled his police baton *946 from his belt and struck McDaniel one time. Officer Vidrine then helped Officer Guillory place McDaniel on the ground. They handcuffed McDaniel, placed him in a police unit, and took him to the Ville Platte Medical Center. Officer Guillory accompanied Officer Green to the medical center.
Officer Vidrine had little independent memory of the incident and testified primarily from his report. He did recall that when Officer Green attempted to turn McDaniel around to place the handcuffs on him, McDaniel "resisted and made an aggressive move to Officer Green." Additionally, he observed Officer Green swing his police baton during the ensuing scuffle but had no recollection as to where the blow struck McDaniel. He and Officer Guillory subdued McDaniel by placing him on the ground and handcuffing him. Officer Vidrine recalled seeing blood on McDaniel's head once he had been placed on the ground. Additionally, he recalled that during the scuffle, McDaniel cursed Officer Green with a racial slur.
Joseph Arnaud and Shannon Guillory initially remained in the vehicle when Officer Green ordered McDaniel to exit. According to both young men, when Officer Green questioned the ownership of the beer, they remained silent but McDaniel continuously repeated his denial that they had anything to do with the bottle-throwing incident. Despite being told to keep quiet so he could complete his investigation, McDaniel continued to ask Officer Green why he had stopped them. As to what happened outside the truck, Guillory and Odom testified that Officer Green hit McDaniel two to five times with a flashlight, not a police baton. Odom testified that immediately after McDaniel exited the truck, Officer Green grabbed him and started hitting him with the flashlight. According to Odom, the other two officers then held McDaniel while Officer Green continued to strike him. Odom was sure the weapon used was a flashlight and not the police baton, because every time Officer Green swung it, Odom could see the light from the flashlight as it was brought across the landscape. Arnaud saw only one blow administered by Officer Green but suggested that there might have been more as his line of vision was affected when McDaniel fell to the ground after the first blow. None of the young men remembered hearing any profanities or racial slurs expressed by McDaniel during the incident.
Although Odom remembered specifics of the incident, Lt. Johnson testified that he saw nothing, because he was involved in giving Odom a field sobriety test. He did observe blood on McDaniel's head after the altercation and ordered that McDaniel be taken to the Ville Platte Medical Center emergency room.
In rendering judgment in favor of Officer Green and the City of Ville Platte, the trial court concluded that Officer Green had probable cause to arrest McDaniel, and therefore, his arrest and subsequent detention were not unlawful. The trial court further concluded that Officer Green did not use unreasonable or excessive force in arresting McDaniel and that McDaniel had no right to resist the lawful arrest. In his appeal, McDaniel asserts that the trial court erred in reaching its factual and legal conclusions concerning the validity of the arrest and erred in dismissing his action.

OPINION
An "[a]rrest is the taking of one person into custody by another." La.Code Crim.P. art. 201. The arrest process requires that there be an actual restraint of the person being arrested and that "restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him." Id. A law enforcement officer may arrest a person without a warrant when "[t]he person ... has committed an offense in his presence...." La.Code Crim.P. art. 213(1). If the arrest is without a warrant, the officer making the arrest *947 must supply the person being arrested with certain information.
A peace officer, when making an arrest without a warrant, shall inform the person to be arrested of his intention to arrest him, of his authority, and of the cause of the arrest....
The officer ... making the arrest need not so inform the person to be arrested if the person is then engaged in the commission of an offense, or is pursued immediately after its commission or after an escape, or flees or forcibly resists before the officer ... has an opportunity to so inform him, or when the giving of the information would imperil the arrest.
La.Code Crim.P. art. 218.
A police officer making a lawful arrest may use reasonable force to arrest and detain a person and to overcome any resistance or threatened resistance of the person being arrested or detained. La. Code Crim.P. art. 220. However, a person may resist an unlawful arrest in order to prevent an illegal restraint of liberty to the extent necessary under the circumstances. White v. Morris, 345 So.2d 461 (La.1977); Melancon v. Trahan, 94-26 (La.App. 3 Cir. 10/5/94); 645 So.2d 722, writ denied, 95-0087 (La.3/10/95); 650 So.2d 1183. Additionally, should a police officer with no probable cause to believe that a person has committed a crime use physical violence to overcome the person's resistance, his actions constitute a battery. Norrell v. City of Monroe, 375 So.2d 159 (La.App. 2 Cir. 1979).
Thus, we must first address whether the arrest by Officer Green was lawful. Officer Green testified that when he arrested McDaniel, he told him he was "being placed under arrest for interfering with the duties of a police officer." Although Officer Green did not specify which statute or ordinance McDaniel had violated, McDaniel was ultimately formerly charged with resisting an officer, a violation of Ville Platte City Ordinance Section 119. At the time of trial of this matter, prosecution on that charge was still pending. Section 119(A), which has as its source La. R.S. 14:108, provides in pertinent part:
It shall be unlawful for any person to commit resisting an officer. Resisting an officer is the intentional interference with, opposition or resistance to, or obstruction of an individual acting in his official capacity and authorized by law or ordinance to make a lawful arrest or seizure of property or to serve any lawful process or court order when the offender knows or has reason to know that the person arresting, seizing property, or serving process is acting in his official capacity.
Since the ordinance tracks the language of La.R.S. 14:108 and lists the statute as its source, jurisprudence interpreting the state criminal statute is applicable to the case sub judice.
In reviewing the jurisprudence interpreting La.R.S. 14:108, we immediately note that the Louisiana Supreme Court has clearly established that simply interfering with a police investigation is not a violation of La.R.S. 14:108. State v. Lindsay, 388 So.2d 781 (La.1980); Melancon, 645 So.2d 722. For one to commit the crime of interfering with an officer as defined in La.R.S. 14:108, the officer must be either making an arrest, seizing property, or serving process at the time of the interference. All the testimony in the present case establishes that Officer Green was not in the process of making an arrest, seizing property, or serving process at the time of his altercation with McDaniel. In fact, the only person arrested on May 7, 1997, was McDaniel.
Since the police officers were not performing one of the three prerequisite duties as required for there to be a violation of La.R.S. 14:108 or Ville Platte City Ordinance 119, there was no probable cause to arrest McDaniel under the ordinance. However, McDaniel's interference does constitute probable cause for his arrest *948 for a violation of La.R.S. 14:103(A)(2). That statute reads as follows:
A. Disturbing the peace is the doing of any of the following in such a manner as would foreseeably disturb or alarm the public:
. . .
(2) Addressing any offensive, derisive, or annoying words to any other person who is lawfully in any street, or other public place; or call him by any offensive or derisive name, or make any noise or exclamation in his presence and hearing with the intent to deride, offend, or annoy him, or to prevent him from pursuing his lawful business, occupation, or duty;
This statute "requires specific intent to deride, offend or annoy the other person." State v. McCoy, 546 So.2d 240, 242 (La. App. 2 Cir.1989)(Emphasis in the original).
Profane and vulgar words spoken to a police officer "without threatening conduct, have been held within the realm of protected free speech, even though the words are shocking to the sensibilities of others. A trained police officer is held to a `higher degree of restraint that[sic] the average citizen' to avoid physical retaliation even to words that might be categorized as `fighting words.'" City of West Monroe v. Cox, 511 So.2d 1200, 1202-3 (La.App. 2 Cir.1987). However, while a police officer must display restraint and not retaliate to a personal verbal attack, the officer does have the right to take steps necessary to pursue his lawful duties.
It is not factually disputed that McDaniel's actions, from almost immediately after the stop, had the effect of preventing Officer Green from performing the most basic investigation. Officer Green was lawfully in a public place, pursuing his lawful duty when McDaniel began his tirade. While the initial rather mild profanity ("b___ s___") is in itself protected speech, that language coupled with McDaniel's refusal to allow Officer Green to ask a question or complete a comment was offensive, derisive, and annoying; and prevented Officer Green "from pursuing his lawful business, occupation, or duty." La.Code Crim.P. art. 103(A)(2).
While Officer Green did not specifically inform McDaniel that he had violated the provisions of La.Code Crim.P. art. 103(A)(2) in making the arrest, he did not have to do so as McDaniel was then "engaged in the commission of an offense." La.Code Crim.P. art. 218. Additionally, the decision to prosecute McDaniel under an ordinance for which he appears to have a valid legal defense does not change the fact that Officer Green had probable cause to arrest him for a criminal violation on the night of May 7, 1997. Thus, we find no error in the trial court's determination that the arrest was lawful.
The more troubling aspect of this litigation involves the degree of force used by Officer Green in making the arrest. Even in a situation where the arrest is lawful, a police officer may only use "reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained." La.Code Crim.P. art. 220. (Emphasis added). Unlike the facts concerning McDaniel's pre-arrest behavior, the facts concerning the degree of force used by Officer Green are in dispute.
An appellate court may set aside a trial court's finding of fact only if it is manifestly erroneous or clearly wrong. Under the manifest error standard of review, an appellate court does not determine whether a factual finding is right or wrong but rather, whether the conclusion is reasonable based on the entirety of the record. Stobart v. State, Through Dep't of Transp. and Dev., 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). Whether or not a police officer has used unreasonable or excessive force is determined according to the facts and circumstances of the case and various factors including the risks and dangers faced by *949 officers, the nature of the offense involved, the existence of alternative methods of arrest and the physical size and strength of the officers as compared to that of the arrestee. Stroik v. Ponseti, 96-2897 (La.9/9/97), 699 So.2d 1072, citing Kyle v. City of New Orleans, 353 So.2d 969 (La. 1977).
Under the facts and circumstances of this particular case, we must determine if the trial court's determination that Officer Green did not use unreasonable or excessive force is manifestly erroneous or clearly wrong. All of the police officers testified that Officer Green struck McDaniel with his police baton one time and one time only. The other witnesses testified that Officer Green struck McDaniel from two to five times with a flashlight, not with a police baton. Normally, such contradictions would be resolved with the medical testimony presented but that is not the case before us.
McDaniel first received medical attention at approximately 11:45 p.m. at the Ville Platte Medical Center Emergency Room. According to Dr. Charles LaHaye, a general surgeon, McDaniel related a history of having been struck in the head with a police baton and was bleeding from a head wound. Dr. LaHaye observed an eight to ten centimeter laceration to the left occipital part of the skull and closed it with thirty to forty surgical staples. McDaniel was then released to the custody of his father, Blaine McDaniel, who had made bail arrangements through Lt. Johnson. Approximately three hours later, McDaniel again appeared at the emergency room complaining of a laceration on the right side of his skull. Dr. LaHaye again examined McDaniel and discovered a four centimeter laceration on the right side of his skull which he repaired with more surgical staples.
On May 12, 1997, McDaniel sought the medical assistance of Dr. Thomas Fontenot, a Ville Platte physician, to have the surgical staples removed. Dr. Fontenot, who was recognized by the trial court as an expert in the family practice of medicine, testified that McDaniel gave him a history of having been hit on the head with a flashlight at least four or five times. The doctor testified that he removed the surgical staples from both a three and a five centimeter laceration on the upper part of the scalp. Additionally, he observed a contusion on McDaniel's left ear which he described as a "battle sign scar," observed two hematomas on the occipital area of the skull, and observed a small bruise on the left shoulder which he suggested might have been caused by a "strap" or a baton. Dr. Fontenot's final diagnosis was that of "multiple contusions to the head and face, with two scalp lacerations and a contusion to the left ear and two hematomas in the occipital area." Additionally, he testified that the injuries he observed were consistent with someone being struck with a flashlight.
When questioned concerning Dr. LaHaye's failure to observe the other injuries he found, Dr. Fontenot testified that the two lacerations and the ear wound would have "been pretty obvious" and that he would have expected Dr. LaHaye to observe the laceration on the right side of McDaniel's head had it been present when Dr. LaHaye first examined McDaniel. On this point, the following exchange took place between Dr. Fontenot and counsel for the defendants:
Q. Doctor if I ask you to assume that the evidence in this case is going to show that when this young man got to the hospital the first time the only injury that was treated was one ten centimeter lick which was sewed up with staples and there were no other injuries complained of and it was not until a little over two hours later that the patient returned to the hospital and complained of a second five centimeter split which when he got to the hospital was bleeding profusely, did you know that before today?
A. No sir.

*950 Q. Well let me ask you something. Now that I've told you that could you explain to the Judge how in the world that could possibly have happened with Dr. LaHaye as the emergency room physician on the first visit?
BY THE COURT:
If that version is found to be so.
A. I don't. he should not, he wouldn't. I don't think he would have missed the second laceration of that size actively bleeding.
Q. So given what I told and assume I'm not lying.
A. Okay.
Q. That everything I told you will be proven by the evidence, what you said earlier about all of these injuries being caused during the incident with the police, you can't say that anymore can you?
A. It would be difficult.
Q. Would it make it almost impossible for you to say that?
A. Yes.
Dr. LaHaye's explanation for not observing the second laceration in the first examination was that when he did observe it, the laceration was under thick hair. He testified that it was possible the laceration was present on the first visit and that the Xylocaine administered to McDaniel's scalp may have impeded the bleeding on the right side. Dr. LaHaye was not concerned that he failed to see the hematomas observed by Dr. Fontenot as, in his opinion, such injuries do not manifest themselves immediately. However, on neither occasion did he notice that McDaniel's ear had been injured.
What happened between the first visit to the Ville Platte Medical Center Emergency Room and the second was addressed by the testimony of McDaniel and his mother and father. All three testified that McDaniel did not sustain additional injuries during the three hour period between the emergency room visits. According to Blaine McDaniel, he arrived at the emergency room and found his son so upset that he requested that Dr. LaHaye order a drug screen to determine what was causing his condition. He testified that he had never seen his son "upset like that." When they arrived home, Sandra McDaniel, Blaine McDaniel's wife and the plaintiffs mother, discovered the other cut, and they returned to the hospital. According to Blaine McDaniel, the next morning they observed the two hematomas and the ear injury observed by Dr. Fontenot.
Mrs. McDaniel explained the three-hour delay in testifying that when the plaintiff and his father arrived home, the three talked for a while and then the plaintiff took a shower. According to Mrs. McDaniel, it was only after the shower that the second laceration was observed.
In rendering its decision, the trial court made the following comments:
The Court has listened very carefully to all of the testimony adduced at trial, has viewed the photos, and perused all of the documentary evidence and has read and studied the excellent briefs filed by both counsel.
In analyzing and giving credence to the testimony of the various witnesses, including that of plaintiff, McDaniel and the defendant, Green, this Court has carefully observed their demeanor while they testified, their facial expressions, their eagerness or their reluctance to answer certain questions, their motives for testifying in the fashion that they did, their body movements and from all of that this Court has drawn inferences and conclusions.
It is obvious that the trial court accepted Officer Green's version of the incident to be the most credible. In doing so, the trial court obviously concluded that Officer Green struck McDaniel only once and that McDaniel's other injuries were sustained in some other fashion. But for the conflicting findings by the medical care providers, we would conclude that the trial court was clearly wrong in reaching these conclusions. In giving courts of appeal *951 guidance in applying the manifest error standard, the supreme court, in Stobart, 617 So.2d at 882-3, stated the following:
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). This court has announced a two-part test for the reversal of a factfinder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. See generally, Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La.1992); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. E[SCO], 549 So.2d 840 (La. 1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-45. Nonetheless, this Court has emphasized that "the reviewing court must always keep in mind that `if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" Housley v. Cerise, 579 So.2d 973 (La. 1991) (quoting Sistler v. Liberty Mutual Ins., Co., 558 So.2d 1106, 1112 (La. 1990)).
This court has recognized that "[t]he reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record). but also upon the proper allocation of trial and appellate functions between the respective courts." Canter v. Koehring Co., 283 So.2d 716 (La.1973). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id.

While we might conclude that our own evaluations and inferences in this matter are more reasonable than that of the trial court, we cannot substitute our judgment for that of the trial court on that basis alone. In light of our review of the record in its entirety and particularly given the conflicting medical testimony, we cannot say that the trial court was clearly wrong in its obvious conclusion that McDaniel received only one injury from one blow administered by Officer Green and that the remaining injuries arose from some other source after he left the hospital emergency room on the first visit. Strictly *952 applying the manifest error rule, as we are bound to do, we find no error in the trial court's conclusion that Officer Green did not use excessive force in arresting McDaniel.

DISPOSITION
For the foregoing reasons, we affirm the trial court's judgment dismissing McDaniel's suit against Officer Green and the City of Ville Platte. All costs of this appeal are assessed against the plaintiff, Karl Coty McDaniel.
AFFIRMED.
COOKS, J., concurs in part and dissents in part and assigns written reasons.
COOKS, J., dissenting.
I agree with the majority opinion, except that portion addressing the excessive force issue.