PATRICIA RIVET MURRAY, Judge.
| defendants, retired New Orleans Police Department [“NOPD”] officer, Sgt. Addie Fanguy, and his employer, the City of New Orleans [“the City”], appeal two related judgments of the trial court. In the first judgment, the court found the City liable for Sgt. Fanguy’s use of excessive force in attempting to arrest Corey Horton and for Mr. Horton’s resulting death. In the second judgment, the court awarded damages to plaintiff Lakiksha Thompson on behalf of her and Corey Horton’s minor child for the wrongful death of Mr. Horton. For the reasons that follow, we reverse the judgments of the trial court.
FACTS AND PROCEEDINGS BELOW
On August 24, 1991, Sgt. Fanguy, who was then Commander of the Major Criminal Investigation Unit for the NOPD, received a call at the Third District Police Station from another officer, who informed him that a stolen blue truck allegedly occupied by brothers Anthony and Corey Horton had just been spotted at a particular gas station in the vicinity of the St. Bernard Housing Development. At this time, there were recent outstanding arrest warrants for Anthony Horton for ^allegedly having committed armed robbery and other violent crimes, including shooting at police officers two days before, in the area of the housing development. The police had additional information that Anthony Horton and his sixteen-year-old brother, Corey, were operating together. There was also an outstanding arrest warrant for Corey Horton. Upon receiving the tip as to the brothers’ whereabouts, Sgt. Fanguy left the district station with two other officers in three separate unmarked patrol cars and went to the scene. He also ordered all marked patrol cars out of the area and that those patrol cars block all entrances to the housing development.
When Sgt. Fanguy spotted the stolen blue truck at the intersection of Gentilly and Trafalgar, he pulled his vehicle in front to block it, while another NOPD officer, Frank Polito, pulled up behind, it and a third officer, Robert Cañedo, pulled up along the passenger side, boxing in the small truck. Corey Horton was driving the truck, with a fifteen-year-old female passenger, Alethea Smith, sitting in the front seat. Also riding in the truck were Corey Horton’s fifteen-year-old girlfriend, Lakiksha Thompson, and Alethea Smith’s one-year-old daughter, Angelnic. Sgt. Fanguy exited his vehicle and with his gun drawn ordered Corey Horton out of the truck. Officer Polito also exited his vehicle and approached Corey Horton. The officers ordered the passengers to get out of the truck and get down to the ground, which they did.
Corey Horton got out of the truck with his hands raised. Exactly what occurred next is in dispute. Sgt. Fanguy testified that as he took hold of Corey | Horton’s shoulder with his left hand in an attempt to “put him” on the hood of the truck, Corey Horton suddenly dropped his right hand and grabbed Sgt. Fanguy’s right hand, in which Sgt. Fanguy was holding his gun. Sgt. Fanguy then spun Horton around to face him, used his leg to trip Horton, and they both fell to the ground. As they struggled while falling, Sgt. Fan- *204 guy claims he felt for his trigger and shot Horton in the chest. According to the plaintiffs’ version of events, Corey Horton did not resist arrest, but kept his arms outstretched and his hands up while Sgt. Fanguy pulled him to the ground and shot him in the chest. There is no dispute that Corey Horton was then shot again in the back of his head by Sgt. Fanguy and also shot at several times by Officer Polito. Sgt. Fanguy testified that he fired his second shot from his position on the ground, lying on his back with his upper torso turned to one side and propped up on one elbow. Corey Horton died as a result of the gunshots, and Sgt. Fanguy was injured at some point by a bullet that grazed his leg.
Plaintiffs filed suit against the City, its mayor, and various NOPD officers, including Sgt. Fanguy, for the wrongful death of Corey Horton. The case was tried on October 5-7, 2004. At the time of trial, the only remaining plaintiff was Lakiksha Thompson, on behalf of her minor daughter Corineisha Thompson, who is also the daughter of Corey Horton.[1] The only remaining defendants were the City and Sgt. Fanguy.[2] The City stipulated that Sgt. Fanguy was in the course |4and scope of his employment as an NOPD officer at the time of the shooting of Corey Horton.
On November 10, 2004, the trial court rendered judgment in favor of the plaintiff on liability and written reasons for judgment. The court reserved the right to award damages in a separate judgment should the parties fail to reach an agreement as to the amount. On February 16, 2005, after the parties notified the trial court that they had been unable to reach a compromise, the court rendered judgment awarding the plaintiff $50,000.00 in survival damages and $75,000.00 for the wrongful death of Corey Horton.
The City and Sgt. Fanguy timely appealed both judgments.
ISSUES
The sole issue on appeal is whether the trial court’s determination that Sgt. Fan-guy used excessive force in apprehending Corey Horton is manifestly erroneous. Specifically, the defendants argue that the trial court committed manifest error by ignoring the expert and scientific evidence suggesting that .there was a struggle between Corey Horton and Sgt. Fanguy,-which resulted in Sgt. Fanguy shooting Corey Horton in self-defense. The defendants also argue that the trial court improperly relied upon eyewitness testimony that was inconclusive because none of the witnesses actually saw Sgt. Fanguy shoot Corey Horton.
APPLICABLE LAW
The factual findings of the trial court are subject to the manifest error standard of review, which precludes our setting aside of those findings unless they Lare manifestly erroneous or clearly wrong in light of the record in its entirety. Cenac v. Public Access Water Rights Ass’n, 2002-2660 (La.6/27/03), 851 So.2d 1006, 1023. The Louisiana Supreme Court has explained this standard as follows:
*205 This court has announced a two-part test for the reversal of the factfinder’s determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong but whether the factfinder’s conclusion was a reasonable one.... The reviewing court must always keep in mind that if the trial court’s findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
Parish National Bank v. Ott, 2002-1562, pp. 8-9 (La.2/25/03), 841 So.2d 749, 753-754 (quoting Stobart v. State Through DOTD, 617 So.2d 880 (La.1993)).
In the instant case, the plaintiff has the burden to prove by a preponderance of the evidence that Sgt. Fanguy used excessive force. Excessive force claims fall under the ambit of the general negligence provision of Louisiana Civil Code article 2315, and the standard duty/risk analysis applies to determine whether the police officer involved was negligent. See, e.g.: Mathieu v. Imperial Toy Corp., 94-0952 (La.11/30/94), 646 So.2d 318; Stroik v. Ponseti, 96-2897 (La.9/9/97), 699 So.2d 1072. The duty/risk analysis consists of a four-part inquiry: (1) Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, ie., was it a cause-in-fact of the harm? (2) Did the defendant owe a duty to the plaintiff? (3) Was the duty breached? and (4) Was the risk and harm caused within the scope of protection afforded by the duty breached? All four questions must be answered m |fithe affirmative for the plaintiff to recover. Mathieu, supra, p. 4, 646 So.2d at 321-322.
Causation is not at issue in the instant case, as it is undisputed that Sgt. Fanguy’s conduct contributed to the death of Corey Horton and that the risk of causing the death of a suspect is within the scope of the duty allegedly breached by an officer who employs excessive force and uses his weapon in his attempt to arrest the suspect. The duty owed by a police officer in approaching and/or arresting a suspect is to act reasonably under the totality of the circumstances. Mathieu, supra, pp. 5-6, 646 So.2d at 322-323; see also: Kyle v. City of New Orleans, 353 So.2d 969 (La.1977). The court must evaluate the officer’s actions against those of an ordinary, prudent, reasonable person placed in the same position as the officer, with the same knowledge • as that possessed by the officer at the. time of the incident. Id., p. 6, 646 So.2d at 322 (citing Kyle, supra, 353 So.2d at 973). In determining whether the officer has acted reasonably, the following factors should be considered: (1) the known character of the arrestee; (2) the risks and dangers faced by the officer; (3) the nature of the offense involved; (4) the chance of the arrestee’s escape if the particular means are not employed; (5) the existence of alternative methods of arrest; (6) the physical size, strength and weaponry of the officer as compared to the arrestee; and (7) the exigency of the moment. Id., p. 6, 646 So.2d at pp. 322-323 (citing Kyle, supra, at 973). Moreover, the scope of the officer’s duty to act reasonably does not restrict the officer to employing only the best of several available alternatives, or the least intrusive; however, the alternative chosen must be a reasonable course under the circumstances. Stroik v. Ponseti, supra, p. 9, 699 *206 So.2d at 1079. Finally, the determination of whether the defendant police officer has breached his duty is a |7question of fact. Id., p. 7, 699 So.2d at 1078 (citing Mundy v. Department of Health & Human Resources, 620 So.2d 811, 813 (La.1993)).
In the instant appeal, the sole issue is whether the trial court committed manifest error by determining that Sgt. Fanguy breached his duty, as described above, to Corey Horton. To resolve this issue, we must consider the record in its entirety.
EVIDENCE PRESENTED
Plaintiffs evidence at trial included the live testimony of Sgt. Fanguy and of four additional witnesses: Courtney Martin, Reynard Martin, Alethea Smith and Lak-iksha Thompson; plaintiff also introduced the deposition testimony of Willie Morris and Nicole Brown.
Sgt. Fanguy testified that he had retired from the police force in 2001 and was, at the time of trial, employed as a corporate aircraft pilot. In August of 1991, Sgt. Fanguy was employed by the NOPD and was investigating a robbery and shooting of two police officers allegedly involving Anthony Horton. In connection with that investigation, Sgt. Fanguy executed a search warrant at the home of Ms. Willie Morris, which residence he believed Anthony Horton had entered immediately after the alleged shooting. Sgt. Fanguy specifically denied having verbally threatened to kill Anthony and/or Corey Horton during the search of Ms. Morris’s home. When questioned by defense counsel, Sgt. Fanguy confirmed that there were several arrest warrants out for Anthony Horton and one out for Corey Horton. Sgt. Fan-guy also had information that the brothers were- working together. They were suspected of having been involved in a shootout with police a few days earlier, and of having shot into an apartment with an infant inside and into a car with two children inside. Several people had reported that the Horton brothers had |sbeen terrorizing the area of the St. Bernard Housing Development for three to four weeks. The police also had information that sometimes Corey Horton would drive a vehicle in which the back seat had been loosened, so that Anthony could hide in the trunk. Both brothers were believed to be armed. At the time he received the phone call that the stolen blue truck had been spotted, Sgt. Fanguy was planning to arrange for helicopter surveillance of the area in order to locate the Horton brothers.
On August 24, 1991, Sgt. Fanguy received a phone call at the Third District Police Station from Officer Christy Williams informing him that a stolen blue truck (which was known to have been occupied by Anthony and Corey Horton earlier that day) had been spotted at a gas station at the corner of Paris Ave. and Gentilly Blvd., near the St. Bernard housing development. Sgt. Fanguy, Officer Polito and Officer Cañedo immediately headed for that area in their individual unmarked police units. Because he was afraid the Horton brothers would flee into the housing development, Sgt. Fanguy ordered all marked police units to leave the area and block the entrances and exits to the development to prevent the suspects from fleeing into the development. When they spotted the blue truck on Gentilly, Sgt. Fanguy pulled in front of it, Officer Cane-do pulled up behind it, and Officer Polito pulled alongside it, boxing in the blue truck. Sgt. Fanguy got out of his vehicle with his gun drawn, and ordered the driver of the blue truck to get out and to put his hands up. Sgt. Fanguy testified that when Corey Horton got out with his hands raised, Sgt. Fanguy grabbed Corey’s left shoulder from behind and started to “put him on the truck.” Sgt. Fanguy stated that as soon as he ordered Corey Horton *207 to put his hands on the side of the truck behind the door, Corey’s right hand dropped towards his waist and was no longer visible to Sgt. Fanguy. Fearing the ^suspect had a weapon in his waistband, Sgt. Fanguy spun Corey around to face him. According to Sgt. Fanguy, Corey spun almost 360 degrees, stepped over Sgt. Fanguy’s leg and then put his hand over Sgt. Fanguy’s right hand, in which Sgt. Fanguy was holding his gun. Sgt. Fanguy grabbed the back of Corey’s neck, and they began struggling for the gun. Sgt. Fanguy then used one of his legs to trip Corey, and they both began falling. Sgt. Fanguy stated that just as his right knee hit the ground, he felt the trigger of his gun and it went off. Almost simultaneously to hearing the gunshot, Sgt. Fan-guy felt a sharp pain in his leg, which made him believe he had been shot. At this point, Sgt. Fanguy still thought Corey Horton might have had a weapon. Sgt. Fanguy heard other shots being fired. He fell backward from his knees, and Corey Horton was- already on the ground. Sgt. Fanguy lifted up, propped himself up on his elbow, and fired at Corey again. One of the other officers helped Sgt. Fanguy to his car and drove him to the hospital. At the hospital, Sgt. Fanguy was treated for an abrasion to his right leg that was possibly caused by the grazing of a bullet, and was told he had a partial ligament tear.[3] Sgt. Fanguy stated that he temporarily wore a brace on his right knee after the incident and that he missed work for approximately five days due to his injury. ‘ In his testimony, Sgt. Fanguy confirmed that no weapon was ever discovered, either on Corey Horton’s person or at the scene.
Alethea Smith testified that on the day of the incident, she and Lakiksha Thompson were riding in the cab of the truck with Alethea’s baby daughter, Angelnie, and that Corey Horton was driving. They were on their way to the west bank of the city to visit Corey’s sister, Connie, because Connie had never seen 110Angelnic. When they stopped for gas, Lakiksha crawled into the back of the truck, which was covered, with the baby to comb the baby’s hair. They left the gas station and were proceeding down Gentilly. At the intersection of Gentilly and Trafalgar, a black Taurus, which she recognized as an unmarked police car, pulled in front of the truck blocking it. A police officer got out and was screaming at Corey, using profanity, ordering Corey to get out of the truck. Corey got out with his hands up. She saw Corey facing the truck, slowly moving down the side of it. Another officer opened the passenger door and yelled at her and Lakeiksha to get out and get on the ground. Alethea was protesting that she was pregnant and that her baby was still in the truck. Eventually, Alethea got to her knees and pulled Angelnie out of the truck and down on the ground with her. While on the ground, Alethea testified she heard two or more gunshots, but did not remember exactly when. She could see under the truck that Corey was lying on the ground, apparently shot. She saw Corey put his arm over his head. She testified she did not remember whether there was a police officer lying on the ground also. Under cross-examination, the witness admitted she had lied to the police investigators about her relationship to the Horton brothers when she had been questioned shortly after the incident because she had been scared, but stated she had later told the truth to the FBI. She also acknowledged that she had told the FBI investigator that she had seen a white *208 male lying on the ground next to Corey Horton after the shooting.
Lakiksha Thompson testified that Corey Horton had gotten the blue truck from a friend of his mother’s named Chip, who had lent him the truck in exchange for Corey’s getting crack cocaine for his mother and Chip. Ms. Thompson confirmed that she was in the cab of the blue truck with Corey Horton, Alethea |n Smith, and An-gelnic, but when they stopped at the gas station, she climbed over the seat to the back with the baby and was combing the baby’s hair. As they drove down Gentilly, a ear pulled in front of them, a man jumped out, and, using profane language, he yelled at Corey to get out of the truck. Corey got out with his hands up. The same officer who had ordered Corey out of the truck noticed her in the back under the camper cover and ordered her to get out. She put the baby on the front seat, climbed over the seat, got out the passenger side, crossed over Alethea, and laid down next to her on the ground. Angelnic was crying and crawling towards the door; so Alethea got up enough to grab the baby and pull her down on the ground with them. When Lakiksha first got out of the car, she could see Corey over the roof of the truck, and he was still standing up. A few seconds after she got down on the ground, she heard shots and then saw Corey was on the ground. From under the truck, she could see Corey’s face. His eyes were open. She heard more shots, and then saw Corey put his hands over his face. She never observed any feet moving under the truck or any indication of a struggle. The witness confirmed that Corey Horton did not have a gun on him at the time of the incident.
Two eyewitnesses to the incident, Courtney Martin and her husband, Renard Martin, Sr., also testified for the plaintiff. Mrs. Martin testified that she was a front seat passenger in a car driven by her husband; they were on Trafalgar approaching a stop sign, intending to turn left onto Gentilly, but there were cars stopped in front of them. Mrs. Martin admitted her vision was “impeded a little bit.” She could not identify the person shooting or recall what type of clothes he was wearing; she only knew he was a Caucasian male. The shooter was on the opposite side of the | ^blue truck from her. She was not sure whether she saw a gun. Mrs. Martin said she did not recall having seen a struggle or having seen anyone attack the shooter.
Renard Martin, Sr., testified that from where his car was stopped, he saw a black Taurus speed up and cut off a small blue truck. He saw a man get out of the Taurus with his weapon drawn, go to the front of the truck, and order the driver to get out. ' At the same time, Mr. Martin observed another man get out of a vehicle that had pulled up behind the truck. Both men instructed the driver to put his hands up. The driver got out of the -truck, and his hands were in the up position. Mr. Martin was looking across the truck. Both officers were standing on the opposite side of the truck, one in front of the driver’s door and one behind it. The one standing in front had a gun pointed at the driver. When the driver first emerged, he was facing the officer standing in front. Then the officers instruct the driver to get to the ground, and the driver turns partially toward the truck (and toward Mr. Martin). Mr. Martin testified ■ that ■ both officers were close enough to touch the driver, within .two or three feet, and the officer in front had one arm extended; however, Mr. Martin could not tell whether the officer was actually touching him. Both officers had their hands positioned in a way that they could have been pushing the driver to the ground from behind, but Mr. Martin could not tell whether they were or not. *209 Mr. Martin saw that the officer in front had his gun pointed at the driver the entire time. As the driver started to go down, he disappeared from Mr. Martin’s view because the truck was in the way. “Like lightening,” Mr. .Martin heard shots fired and saw the officer in front step back and saw that officer’s hand recoil, as if he had fired a gun. He could not actually see who fired the shots. Almost simultaneously to the gunshots, Mr. Martin saw two females get out the passenger side of the truck when ordered by another officer. | iaWhen he heard the gunshots, Mr. Martin put his vehicle in reverse and left. He testified that he never saw the driver of the blue truck resist or do anything uncooperative. Unlike his wife, Mr. Martin stated that there were no cars stopped in front of theirs at the stop sign.
A third independent eyewitness, Nicole Brown, was unavailable to testify at trial, but her deposition testimony, taken in 1998, was introduced into evidence by the plaintiff. Ms. Brown, who was nineteen years old on August 24, 1991, when the incident occurred, stated that she was seated in the front seat of a truck being driven by her grandfather, who was in the process of backing the truck into the driveway of Ms. Brown’s family home at 1910 Gentilly. They intended to load the truck with things Ms. Brown was going to take with her to college. Ms. Brown heard a loud voice saying “Stop the truck,” at which point her grandfather stopped. She then saw a blue Mitsubishi truck stop directly in front of her with three cars boxing it in. Two people, whom she later realized were police officers, were running toward the blue truck, one from the front and one from the rear. Ms. Brown testified that she had an unobstructed view of the driver’s side of the blue truck. The officers were screaming obscenities, yelling at the driver to get out of the truck. The driver fumbled with the door handle briefly, then got out and put his hands up in the air. The two police officers moved closer to the driver, Corey Horton, with their guns drawn. One officer grabbed Corey; that officer was wearing a white shirt and blue jeans.[4] Corey was beginning to assume a frisk position, to go toward the ground with his hands stretched out in front of him. Ms Brown saw the same officer who had first grabbed Corey begin to push Corey, and |14then he kicked Corey. .A few seconds later, Ms. Brown heard a single gunshot, followed by ' a pause, then seven or eight more, shots. She could not tell which officer had fired the first shot. Ms; Brown did not know whether Corey’s hands had gone all the way to the ground when the first shot was fired, but she stated that Corey’s hands were definitely out in front of him when the shot went off. Ms. Brown stated that Corey Horton was facing her the entire time; he never turned to face the blue truck. Ms. Brown never saw Corey Horton attempt to grab one of the police officer’s guns; she never saw him wrestle with the officers. She testified that, the one thing she was “absolutely clear about” was that Corey Horton’s hands were either out in front of him or up in the air the entire time, from the time he exited the truck until the time the first shot was fired. After the shooting, Ms. Brown noticed that one of the officers was lying on the ground with Corey. Ms. Brown then got out • of her grandfather’s truck and went inside her house to call 911 for an ambulance. As she came out her front door, another police officer, wearing cam *210 ouflage pants, came over and told her and her grandfather to go inside and lock the door, because there could be an armed man in the area, who had possibly escaped from the back of the blue truck. She and her grandfather ignored the warning and remained on the porch of the house. Ms. Brown stated that the police officer that was lying on the ground was grabbing his leg; when that officer stood up, he was limping, and another officer helped him to one of the cars, and they drove off. Ms. Brown testified that the entire incident took place very quickly, probably in about two minutes. Ms. Brown stated that she did not know Corey Horton or his family prior to this incident.
Finally, the plaintiff introduced the deposition testimony of Ms. Willie Morris; On August 23,19.91, Ms. Morris was at her apartment at 3629 St. Bernard |1sAvenue when some police officers, including Sgt. Fanguy, kicked in her back door and searched her residence looking for Anthony Horton, who.Ms. Morris said she did not know. According to Ms. Morris’s testimony, during the course of the search, Sgt. Fanguy told Ms. Morris that when he caught Anthony Horton, he was going to kill Anthony and his brother too.
The defendants’ case, in addition to Sgt. Fanguy’s testimony and physical evidence such as clothing, photographs of the crime scene, medical records and autopsy reports, included the live testimony of NOPD officers Robert Cañedo, Christy Williams, and David Dautrive, as well as several officers connected with the crime lab, a police dispatcher, and forensic expert Dr. Paul McGarry. The defendants also introduced the deposition testimony of Officer Frank Polito, who had died prior to trial.
Officer Polito’s deposition was taken in 1996. He was in the vehicle that pulled behind Corey Horton’s truck. He got out of his car and went to the truck with Sgt. Fanguy. Officer Polito’s testimony corroborated that of Sgt. Fanguy in all respects. Officer Polito said Corey Horton got out of the truck with his hands about shoulder high and automatically turned to face the truck. As Sgt. Fanguy grabbed Corey from behind and pushed him toward the truck, Officer Polito saw Corey drop his hand to his waistband area. Sgt. Fan-guy then spun Corey around, and Officer Polito saw Corey’s hand go over Sgt. Fan-guy’s gun. At that point, Sgt. Fanguy and Corey struggled, and Sgt. Fanguy started yelling repeatedly, “He’s got my gun.” Then Sgt. Fanguy and Corey, who were facing each other and struggling, started to fall to the ground, seemingly tripping over one another. While they were on their way to the ground or just as they hit the ground, Officer Polito heard a gunshot. At this point, Officer Polito was standing just over Sgt. |1fiFanguy’s right shoulder, about four feet away. Officer Polito heard a second shot; then Sgt. Fanguy yelled, “I’m shot,” and fell back limply.[5] Officer Polito then fired two shots downward at Corey Horton. After checking to see that Corey Horton was no longer a threat, Officer Polito turned his attention to Sgt. Fan-guy, who was lying in the street. Officer Cañedo came around from the other side of the truck, and the two officers helped Sgt. Fanguy to his police car. Officer Cañedo then drove Sgt. Fanguy to Charity Hospital.
Officer Robert Cañedo testified that he was at the Third District Police Station with Sgt. Fanguy and Officer Polito on the *211 day the call came in informing them that the stolen blue truck allegedly occupied by the Horton brothers had been spotted at a gas station on Paris Avenue. He immediately grabbed his radio and left in his car followed by the other two officers. They were at a stop sign when the blue truck passed them going in the opposite direction. The three police vehicles each made a U-turn, followed the truck, and eventually boxed it in. Officer Cañedo pulled up alongside the passenger side of the truck. He got out of his vehicle and noticed through the heavily tinted windows of the truck the outline of a person sitting on the passenger side. Officer Cañedo ordered the occupant to open the door and get out of the truck; he denied using profanity to order the person out. A female got out of the truck, and the officer then observed a baby on the seat, whom he handed to the female. Then Officer Cane-do saw a second female in the rear of the truck, and ordered her out. He then crawled into the back of the truck to make sure there was no one else in it. During all this time, Officer Cañedo had his gun in his right hand, and he was aware through his peripheral | 17vision that the driver had also gotten out of the truck on the other side. As officer Cañedo was crawling out of the back of the truck, he heard shots fired. Several seconds before he heard the shots, he heard Sgt. Fanguy’s voice saying “He’s got my gun.” Officer Cañedo immediately ran around to the other side of the truck, where he saw both Sgt. Fan-guy and the suspect (Corey Horton) lying on the ground. Officer Cañedo checked the suspect’s carotid artery for a pulse, but found none. He also found no weapon on the suspect or in the area. Sgt. Fanguy was on the ground with an ashen complexion, saying that he was shot in the leg. Officer Polito and Christy Williams were also there. Officer Cañedo then picked up Sgt. Fanguy, put him in his vehicle, and drove him to the hospital.
' Lt. Christy Williams testified that she had been an NOPD officer for twenty-three years. On the day of the incident in 1991, she was off duty when she saw a blue low-rider truck with tinted windows and an Alabama license plate stopped at a gas station on Paris Ave. and Gentilly Blvd. She had learned the night before that the Horton brothers were thought to be in possession of this stolen truck. Because she had no radio or cell phone with her, Lt. Williams pulled into a Popeye’s restaurant across the street and used the restaurant’s phone to call the Third District Police Station, while keeping an eye on the blue truek. The truck pulled off while she was on the phone. She crossed the street in her vehicle, got out, and tried unsuccessfully to flag down two marked police cars that “flew” past her. She then heard shots about two blocks away. She heard one shot, then a pause, followed by four more shots. She got in her car and went to the scene, arriving in about thirty seconds; there she- saw Sgt. Fanguy and another person lying in the street. Lt. Williams helped the other two officers who were there put Sgt. Fanguy into one of the unmarked police cars. She testified that Sgt. Fanguy could not walk on his own | isbecause his knee was hurt. According to Lt. Williams, Sgt. Fanguy told her then that the guy (the suspect) had tried to take his gun away. On cross-examination, Lt. Williams admitted that when she called the Third District, she said the Horton brothers were in the blue truck, which she had assumed was true although, because of the tinted windows, she had only been able to see the outline of a male figure driving the truck. Lt. Williams also testified that during the incident, there was a broadcast on the police radio indicating that someone in a white shirt had escaped out of the back of the truck.
*212 Officer David Dautrive testified that he had been involved in the execution "of the search warrant at Willie Morris’s home on August 23, 1991. He remained in the kitchen with Ms. Morris the entire time. He never heard Sgt. Fanguy or anyone else threaten to kill the Horton brothers during the execution of the warrant.
William Giblin testified that he was a criminalist working in the NOPD crime lab in 1991. He authored the crime lab report issued September 20, 1991, concerning the incident in question. He testified that there was sooting and gunpowder residue found on the front right leg of Sgt. Fan-guy’s jeans near the calf. There was no bullet hole in the jeans, but they tyere torn on the right leg near the sooting. In his experience, the witness believed that the sooting indicated there had been a gun fired within inches of or in direct contact with the cloth, and the tear in the fabric could have been caused by the slide of an automatic weapon (such as the one Sgt. Fanguy was carrying), which moves rapidly when the weapon is fired. The witness admitted that he had not included the “slide” theory in the report. He also testified that there was type A blood (stipulated to be Corey Horton’s blood) on the right lower side to the back of Sgt. Fan-guy’s shirt and in six spots on Sgt. ImFanguy’s pants, including a stain on the back of the pants just above the pocket at the waist. The witness also testified that Corey Horton’s shirt had gun residue and sooting on the inside, and had two holes that were symmetrical when the shirt was folded in a certain way, which indicated the bottom of the shirt had been pushed up and the gun barrel was in contact with Corey Horton’s chest when the shot was fired.
Officer Debra Prosper, a technician in the crime lab at the time of the incident, testified that she arrived at the scene to collect evidence approximately one hour and ten minutes after the shooting of Corey Horton. She recovered two bullets from the ground, one lying between Corey Horton’s arm and leg, and the other lying next to his knee.[6] She also recovered five bullet casings from the scene.
John Landry, who was the commander of the NOPD crime lab in 1991, testified that he signed the crime lab report and the firearms inspection report, which were placed in evidence. As a result of his testimony concerning the physical evidence, the parties stipulated that there were three bullets discharged from Sgt. Fanguy’s gun, two of which were retrieved from Corey Horton’s body during the initial autopsy and a third that was retrieved from the scene (lying on the ground between Corey Horton’s arm and leg); they also stipulated there were two bullets discharged from Officer Polito’s gun, one of which was retrieved from Corey Horton’s body and one from the crime scene.
Stephanie Briscoe, a police dispatcher, read from and interpreted the complaint history, which she described as a written record of the information that | P,nwas called into police headquarters, either by police officers or citizen complainants, which was typed up contemporaneously by the police operator receiving the calls. The complaint history for the day in question reflects that at 1:38 p.m., Sgt. Fanguy reported he was dispatched to and arrived on the scene. At 1:39 p.m., Officer Polito relayed that he was assisting Sgt. Fanguy at Gentilly and Trafalgar and called in a “108”, which indicates a police officer’s life is in danger. At 1:40 p.m., six different police units called in to say they were *213 responding. At 1:42 p.m., the dispatcher, received a “911” call from a complainant at 1910 Gentilly Blvd. stating that a police officer had shot a man in the street. At 1:42 p.m., there was a call that a police officer was down, and at 1:43 p.m., a call that Sgt. Fanguy was being relocated to Charity Hospital. Finally, at 1:46 p.m., Officer Polito called in information that Anthony Horton, a Negro male wearing a white shirt and blue jeans, could still be at large and might be headed to the Fifth District.
The defendants’ only expert witness, Dr. Paul McGarry, was accepted as an expert in the field of forensic pathology. Dr. McGarry testified that he performed .an autopsy on Corey Horton on August 25, 1991. He found four gunshot wounds. Wound “A” was a contact wound, indicating that the muzzle of the gun was touching Corey’s chest when fired. This bullet was fired downward at approximately a forty-five degree angle, backward and leftward, and ultimately lodged in the left lung. This information was determined from the pattern of soot staining and gunpowder residue. The bullet from wound “B” went in behind and below the left ear, traveled across the base of the skull, and came out the right cheek. The bullet from wound “C” went into the lower back, traveled upward and rightward, and came out the right side of the chest in line with the front of the arm. Finally, the bullet from wound “D” went into the back of the neck at its | ^juncture with the head, traveled upward, leftward and forward, into the brain stem, lodging at the base of the skull. Bullets “A” and “D” were fired from the same gun, later determined to be that of Sgt. Fanguy, and were both recovered from inside Corey Horton’s body. Bullet “C” was fired from a different gun, later determined to be that of Officer Poli-to, and was found lodged in Corey Horton’s clothing; Bullet “B” was not recovered in the autopsy, but the evidence from it was consistent with it having been fired from Officer Polito’s gun. It was impossible for Dr. McGarry to determine which wound occurred1 first, but the time sequence of all four was very close together.
Dr. McGarry opined that wound “A” (the chest wound) was the fatal wound, because it would have killed Corey Horton either instantaneously or within five to ten minutes. Wound “D” (the head wound) would have also been fatal within minutes to hours. The other two wounds were not fatal. In addition to the four gunshot wounds, Corey Horton had abrasions or bruising of the skin on his chest, his right hand, his elbows, his knees and the right side of his neck, which were the type of contusions caused by the striking of the body against rough surfaces, as might occur in a struggle. There was evidence of cocaine in Corey Horton’s urine and eye fluid, but not in his blood. From the totality of his findings in the autopsy, Dr. McGarry opined that it was more likely than not that Corey Horton had been involved in a struggle at the time he was shot. He also confirmed that another autopsy was performed by Dr. Michael Baden by order of the FBI, which report was introduced into evidence. Dr. McGarry testified that Dr. Baden’s autopsy agreed with his in all findings. On cross examination, Dr. McGarry admitted that some of the individual findings he made could have been caused absent a struggle, l^but he believed that all the findings taken together clearly indicated that a struggle had occurred.
DISCUSSION OF LAW AND EVIDENCE
In written reasons for judgment, the trial court judge stated that she found the symmetrical hole patterns in Corey Horton’s shirt to be inconsistent with a *214 struggle because they indicate the shirt was pushed up rather than twisted as in a struggle. The trial court also concluded that, despite Dr. McGarry’s uncontradicted opinion, the physical evidence was inconsistent with Sgt. Fanguy’s description of events. In particular, the trial court noted that Sgt. Fanguy testified he fired both shots as he lay on the ground facing Corey Horton, and that there was no justification for the second shot to the back of Corey Horton’s head. Moreover, if Sgt. Fanguy fired the first shot in contact with Corey Horton’s chest from his position on the ground, he would have then had to “roll 40 degrees towards his right and shoot from behind his head”' in order to land the second shot into the back of Corey Horton’s head.
Finally, the trial court judge stated that she was particularly persuaded by the testimony of the three independent witnesses, Mr. and Mrs. Martin and Nicole Brown. Considered together, their testimony convinced the court that Corey Horton exited the truck with his hands up and was completely surrounded by police officers with sufficient manpower to arrest him. In support of her conclusion that excessive force was used, the trial court judge noted that although the police officers reasonably suspected that Corey Horton was armed, no weapon was ever found.
| j>sAppellants argue that the trial court’s conclusion is manifestly erroneous in that it discounts the uncontradicted expert testimony of Dr. McGarry, misinterprets the undisputed physical evidence, and unduly relies upon the testimony of the three independent witnesses. With regard to these witnesses, appellants argue that neither Mr.or Mrs. Martin was able to see the actual shooting take place, and that the testimony of Nicole Brown conflicted with virtually all the scientific and physical evidence. Appellants further argue that the fact that Sgt. Fanguy fired one shot in contact with Corey Horton’s chest and another shot into the back of Corey’s head supports the conclusion that a struggle occurred rather than the opposite conclusion, as indicated by the trial court. Finally, appellants assert that in the absence of a struggle, there is no plausible explanation for the fact that Sgt. Fanguy apparently fired a random shot to the ground grazing his own leg, injuring himself, or for the fact that Sgt. Fanguy himself ended up lying on the ground next to Corey Horton.
Our task is to determine whether the trial court’s conclusion that Sgt. Fanguy employed excessive force is reasonable considering the record as a whole. We find that it is not.
We first note that the trial court apparently based its decision at least in part on several erroneous assumptions about the evidence. In its reasons for judgment, the trial court states that Dr. McGarry admitted if Sgt. Fanguy fired the first shot in contact with Corey Horton’s chest, Sgt. Fanguy would have had to then roll forty degrees to his right and shoot from behind his head to fire the second shot into the back of Corey’s head. The trial court’s characterization does not match Dr. McGarry’s testimony, however. Dr. McGarry indicated that if Sgt. Fanguy was still facing Corey Horton (and both were on the ground) when the second shot was | yffired, Corey Horton would have had to roll his head forty degrees to the right for the bullet to have entered where it did, which movement Dr. McGarry confirmed was possible. Later, in the reasons for judgment, the trial court notes that Sgt. Fanguy testified to having fired two shots as he lay on the ground facing Corey Horton, but Sgt. Fanguy did not so testify; he always maintained that he fired the first shot during a struggle for the gun as *215 he and Corey Horton were falling to the ground. Finally, the trial court indicates in its reasons for judgment that Mr. Giblin believed Corey Horton’s shirt would have been twisted, rather than pulled up as it was, had there been a struggle. However, this is not an accurate description of Mr. Giblin’s testimony. According to the record, Mr. Giblin opined that either scenario — the shirt pushed up or the shirt twisted — would be indicative of a struggle.
Apparently based upon these inaccurate assumptions about the testimony, the trial court concluded that the physical evidence did not support Sgt. Fanguy’s version of how the shooting occurred. We find, however, that the trial court’s clearly inaccurate characterization of pertinent evidence constitutes manifest error. Under the law, our finding that a manifest error of material fact has been made in the trial court compels us to redetermine the facts by reviewing the entire record de novo. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
Upon de novo review, we conclude that the plaintiff failed to meet her burden of proving by a preponderance of the evidence that Sgt. Fanguy employed excessive force. Rather, we find that the record in this case presents the situation in which the totality of the evidence, and the inferences to be drawn from it, does not preponderate in favor of either the plaintiff or the defendants.
| j>BSgt. Fanguy and Officer Polito both testified that Corey Horton reached toward his waistband as if he had a weapon, and then put his hand over Sgt. Fanguy’s hand that held his gun, which precipitated a struggle. Both Officer Polito and Officer Cañedo heard Sgt. Fanguy shout, “He’s got my gun.” The only forensics expert who testified was Dr. McGarry, who opined that the physical evidence indicated that a struggle had occurred. Although he admitted on cross-examination that some of the abrasions and bruising on Mr. Horton’s body could have been caused without a struggle having taken place, he was nevertheless convinced that all the physical evidence taken together clearly indicated a struggle. The results of Dr. McGarry’s autopsy were confirmed by a second autopsy and report done at the behest of the FBI, which was also introduced as evidence. Thus, the sole expert testimony and the physical evidence in the case support Sgt. Fanguy’s and Officer Polito’s account of how the shooting transpired.
However, the testimony of the fact witnesses is in conflict. Sgt. Fanguy and Officer Polito were the only two persons who actually saw what happened between Sgt. Fanguy and Corey Horton. Their version of events is contradicted by the testimony of the three independent eyewitnesses and the two people who were riding in the truck with Corey Horton, none of whom had a completely unobstructed view of the incident. Two of the independent eyewitnesses, Mr. ■ and Mrs. Martin, had their view impeded by the blue truck; however, each believed he saw one of the police officers stretch his arm out and recoil it back as if he had shot a gun, presumably from a standing position. The third witness was Nicole Brown, who testified by way of deposition. Ms. Brown, although she did not actually see Sgt. Fan-guy shoot Corey Horton, testified that she had an unobstructed view from her driveway; that as soon as Corey Horton exited the truck he turned to face in her Indirection and remained facing her the entire time; and finally, that she was certain Corey Horton’s hands were either out in front of him or up in the air from the time he exited the truck until the time the first shot was fired. Although the testimony of these witnesses sometimes diverged as to certain details and as to the sequence *216 of events, none of the three ever saw Corey Horton struggle with the officers.
We recognize that great deference is owed to the trial court in making credibility calls.[7] Rosell v. ESCO, supra, at 844. However, where documents or objective evidence so contradict a witness’s story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the story, thé appellate court may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. Id. at 844-845; Rosenthal v. Betsy’s Pancake House, Inc., 2000-1546, p. 8 (La.App. 4 Cir. 5/16/2001), 789 So.2d 35, 40. In the instant case, the trial court found that the police officers justifiably believed Corey Horton could have been armed, but the court apparently disbelieved the officers’ testimony that Corey reached for and then tried to take control of Sgt. Fanguy’s gun. Moreover, the court obviously believed the witnesses who testified that Corey Horton was cooperative at all times, and was especiálly persuaded by the testimony of the three independent witnesses.
Nevertheless, we find the trial court’s conclusion based on this testimony to be unreasonable. The record clearly shows that Mr. and Mrs. Martin had an obstructed view of the scene and were too far away to give definitive testimony as to what occurred. Nicole Brown, who said her view was unobstructed, also testified that Corey Horton was facing her the entire time until he was shot. Under |CTthe factual scenarios propounded by both the plaintiff and the defendants, however, Sgt. Fanguy was facing Corey Horton, which would mean that he was between Corey Horton and Nicole Brown. Therefore, the fact that Nicole Brown saw Corey Horton’s hands stretched out in front of him, toward Sgt. Fanguy, would not necessarily exclude the possibility that Corey Horton reached for Sgt. Fanguy’s gun at some point, without this motion having been in Nicole Brown’s direct view. However, to meet her burden of proof, the plaintiff had to show, considering the factors enunciated by the Louisiana Supreme Court in Kyle v. City of New Orleans[8], that Sgt. Fanguy’s use of force was unjustified. Under the circumstances, Corey Horton’s mere reaching for the gun clearly would have justified Sgt. Fanguy’s use of force to repel him. Thus, even if we were to discount the testimony of the police officers, as the trial court obviously did, we still cannot find, on the basis of this record, that the plaintiff met her burden to affirmatively prove her case. Even though a trial court may disregard the testimony of a defense witness, the court’s refusal to credit such testimony cannot act as affirmative proof in favor of the plaintiff. Stroik v. Ponseti, supra, pp. 11-12, 699 So.2d at 1080.
Therefore, because the plaintiff had the burden to prove by a preponderance of the evidence that Sgt. Fanguy used excessive force and failed to meet that burden, we hold that the trial court was clearly wrong in ruling in favor of the plaintiff. On the basis of the record, we reverse the trial court’s finding of liability on the part of the defendants and the subsequent award of damages based upon that finding.
^CONCLUSION
Accordingly, for the reasons stated, we reverse the judgments rendered by the *217 trial court on November 10, 2004, and on February 16, 2005.
REVERSED.
BELSOME, J., dissents with reasons.

. Just prior to the commencement of the trial, plaintiffs’ counsel voluntarily dismissed the claims of Lekiksha Thompson, individually, and of Alethea Smith, individually and on behalf of her minor child, Angelnic Smith, and as the administratrix of the estate of her deceased minor child, Anthony Corey Smith.

. Prior to trial, plaintiffs voluntarily dismissed defendants Robert Cañedo, Arnesta Taylor, and Sidney Barthelemy. At the beginning of trial, the court, upon the motion of the defendants, dismissed all claims against deceased officer, Frank Polito, on the basis that plaintiffs had not substituted a viable party in his place.

. Medical records from Charity Hospital introduced into evidence confirm that Sgt. Fan-guy was treated for a graze wound and swelling of the knee.

. The physical evidence showed that Sgt. Fan-guy was wearing a white shirt and blue jeans at the time of the incident.

. At a later point in the deposition, Officer Polito testified that Sgt. Fanguy yelled he was shot after the first gunshot, not the second.

. The crime lab report confirmed that of the two bullets on the ground, one was fired from Sgt. Fanguy’s gun, and one was fired from Officer Polito’s gun.

. We note, however, that because Nicole Brown’s testimony was by deposition only, the trial court was in no better position to assess credibility than is this court, and the usual requirement of giving deference to the trial court does not apply.

. Kyle v. City of New Orleans, supra, 353 So.2d at 973.